UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Crim. No. 05-10003-NMG |
| v. | ) | |
| | ) | |
| ARTHUR GIANELLI, | ) | |
| JOSEPH YERARDI, JR., | ) | |
| DENNIS ALBERTELLI A/K/A "FISH," | ) | |
| PHILIP PUOPOLO, | ) | |
| SALVATORE RAMASCI A/K/A "LEFTY," | ) | |
| FRANK IACABONI, | ) | |
| RANDY ALBERTELLI, | ) | |
| STEPHEN RUSSO A/K/A "MOON," | ) | |
| MICHAEL PINIALIS A/K/A "MAX," | ) | |
| ENEYDA GONZALEZ RODRIGUEZ, | ) | |
| MARY ANN GIANELLI, | ) | |
| GISELE ALBERTELLI, and | ) | |
| RAFIA FEGHI A/K/A RAFIA YERARDI, | ) | |
| | ) | |
| Defendants. | ) | |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION
TO MOTIONS TO SUPPRESS FRUITS OF SEARCH WARRANTS**

Defendants Arthur Gianelli and Philip Puopolo have filed motions to suppress the fruits of

search warrants.  Those motions are without merit and should be denied.

The Search Warrants

Gianelli challenges the search warrant that was issued on March 5, 2004 by Essex Superior

Court Associate Justice Richard E. Welch III, authorizing the search of Gianelli's home.

Puopolo challenges the search warrants that were issued a year later, on March 3, 2005, by

Middlesex Superior Court Associate Justice Regina L. Quinlan, authorizing the search of Puopolo's

home and of the Revere Businessmen's Association ("RBA").

<u>There Was Probable Cause for the Search Warrants</u>

Gianelli and Puopolo argue that the search warrant affidavits failed to establish probable cause.  That is not correct.

As the First Circuit has recently reiterated, a reviewing court must review a search warrant affidavit "in a practical, commonsense fashion and give considerable deference to the issuing [judge's] conclusion that probable cause has been established.  The relevant inquiry is whether the facts presented in the affidavit would warrant a man of reasonable caution to believe that evidence of crime will be found.  We do not require that the belief be shown to be necessarily correct or more likely true than false." *United States v. Woodbury*, 511 F.3d 93, 98 (1st Cir. 2007) (citations and internal marks omitted).

"Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. McFarlane*, 491 F.3d 53, 57 (1st Cir. 2007) (citations and internal marks omitted).  In determining the sufficiency of an affidavit, the reviewing court "consider[s] whether the totality of the circumstances stated in the affidavit demonstrates probable cause....  [The reviewing court must] examine the affidavit in a practical, common-sense fashion and accord deference to reasonable inferences the [issuing judge] may have drawn from the attested facts. ... In a doubtful or marginal case, the court defers to the issuing [judge's] determination of probable cause." *United States v. Greenburg*, 410 F.3d 63, 66-67 (1st Cir. 2005), quoting approvingly from *United States v. Barnard*, 299 F.3d 90, 92-93 (1st Cir. 2002) (citations and internal marks omitted).

Moreover, "The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather can be inferred from the type of crime, the

nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide evidence of a crime." *United States v. Feliz*, 182 F.3d 82, 88 (1st Cir. 1999) (citation and internal marks omitted).

Thus, "Even without direct evidence, common sense, buttressed by affiant's opinion as a law enforcement officer, might permit the inference that the defendant would be likely to keep evidence relating to drug transactions at his apartment." *Woodbury*, 511 F.3d at 98 (citation and internal marks omitted).

The Gianelli and Puopolo search warrant affidavits easily satisfy those standards.

<u>The Gianelli Search Warrant</u>

The 49-page affidavit of Massachusetts State Police Trooper Pasquale Russolillo in support of the March 5, 2004 Gianelli search warrant ("Gianelli Aff.")[1] explicitly incorporated by reference and attached copies of ten (10) prior affidavits by Trooper Russolillo's colleague, Nunzio Orlando -- dated October 31, 2003, November 13, 2003, November 26, 2003, December 12, 2003, December 23, 2003, December 31, 2003, January 9, 2004, January 26, 2004, February 10, 2004, and February 25, 2004 -- which had been submitted in support of applications for wiretap warrants.  (Gianelli Aff. at 1-4, 12, 17, 26, 33, 40, 45).  All but one of those wiretap orders had been issued by Justice Welch, who also issued the search warrant.  Copies of those Gianelli wiretap affidavits (referred to herein, *e.g.*, as "10/31/03 Aff.") -- which collectively total approximately 840 pages (not including the monitoring instructions) -- are being submitted herewith as Exhibits 2 through 11.

---

[1]       The copy enclosed with Gianelli's motion was incomplete, so a complete copy is being submitted herewith as Exhibit 1.  All exhibits to this brief are being filed under seal and have previously been produced to the defendants during discovery (Bates numbered 0002-0089, 0122-0226, 0259-0382, 0416-0489, 0523-0591, 0627-0663, 0765-0888, 0931-1098, 1143-1188, 1224-1248, 1505-1553, 6746-7452).

Even a cursory review of those affidavits demonstrates that there was plentiful evidence supporting a finding of probable cause that Gianelli was engaging in illegal gaming activities in Massachusetts.  Among other things, the evidence included the following:

♦ A reliable confidential informant ("CI-1") provided information based upon his[2] own gaming relationship with Gianelli and on conversations with other people involved in illegal bookmaking.  CI-1 stated that Arthur Gianelli was presently operating a large-scale gaming operation comprised of numerous agents, bettors, and other operatives and that Gianelli's gaming syndicate was one of the largest illegal bookmaking organizations currently operating in Massachusetts.  (10/31/03 Aff. at 29-30).

♦ Gianelli told CI-1 that Gianelli was using an offshore betting office called Duke Sports in Gianelli's bookmaking business.  (10/31/03 Aff. at 30, 32).

♦ Another reliable confidential informant ("CI-2") also said that Gianelli had recently moved his central bookmaking office to "the islands," referring to an offshore location.  (10/31/03 Aff. at 39).

♦ CI-1 and CI-2 each told of occasions when there were disputes related to their illegal gaming activities with the Gianelli organization.  Each of the informants said that Gianelli personally met with the informant to resolve those situations.  (10/31/03 Aff. at 41).

---

[2] In this brief, we will refer to the confidential informants as males, regardless of their actual gender.

- ♦ Telephone calls intercepted after January 27, 2004 and physical surveillance showed that Gianelli currently supervised and controlled the activities of the Gianelli gaming organization, with Dennis Albertelli and Salvatore Ramasci facilitating the day to day activities of Gianelli's sizeable gaming syndicate. The offshore bookmaking office, Duke Sports, was disseminating betting lines and registering bets from the more than 150 bettors and agents of the Gianelli organization.  Albertelli was the organization's on-line representative, whose responsibilities included establishing customer accounts, setting and adjusting wager limits, and terminating betting accounts of delinquent bettors. Agents of the Gianelli gaming organization would contact Albertelli on an almost daily basis to modify customer accounts, terminate accounts, or discuss the gambling activities of their clientele. Ramasci was Gianelli's principal "runner." Ramasci was using his vehicle on an almost daily basis to drive to various locations in Massachusetts to meet agents and/or bettors to settle outstanding gambling debts. (2/10/04 Aff. at 5).

- ♦ In an intercepted conversation on February 9, 2004 at 11:35 a.m., Gianelli called Dennis Albertelli and asked whether Ramasci had sent the balance sheets.  Gianelli complained about Ramasci keeping the gambling money that Ramasci was collecting for the Gianelli gaming organization at Ramasci's house, Ramasci's mother's house, and Ramasci's sister's house.  Gianelli encouraged Albertelli to secure the money from Ramasci once Albertelli returned home from vacation, so that it would remain safe in Albertelli's possession.  (2/10/04 Aff. at 9-10).

There was also probable cause that evidence of Gianelli's illegal gambling operation would be found inside Gianelli's house.  As Trooper Russolillo pointed out in his search warrant affidavit, bookmaking is the type of activity that by its very nature requires the keeping of incriminating records and "dirty" cash -- because that is the only way the bookmaker can settle up with his bettors. (Gianelli Aff. at 7-11).

Trooper Russolillo was certainly qualified to make that observation, given his extensive law enforcement background, which included many successful long-term gambling investigations that had resulted in the arrests of more than fifty (50) people for violations of the Commonwealth's gaming laws.  Trooper Russolillo had personally conducted physical surveillance of bettors, bookmakers, and other people involved in gaming activities; worked undercover placing bets and associating with bookmakers; executed many search warrants relating to betting and bookmaking; monitored hundreds of hours of wiretapped conversations concerning illegal gaming; and testified about gaming in courts of the Commonwealth and in U.S. District Court.  (10/31/03 Aff. at 2-4).

The search warrant affidavit set forth additional evidence establishing probable cause to believe that evidence of illegal bookmaking would be found inside Gianelli's home, including, among other things, the following:

- ◆     Wiretapped conversations intercepted since October 31, 2003 indicated that Dennis Albertelli would download, from the Duke Sports website, reports of the betting activity of customers and agents of the Gianelli gaming organization; would prepare gaming related paperwork for the Gianelli gaming organization every Monday morning; and then would fax the information to Gianelli *at Gianelli's home*, where

Gianelli and Ramasci would the review activity and notify Albertelli of any errors in the gaming records.  (12/23/03 Aff. at 5).

♦ CI-1 and CI-2 said that Ramasci would usually begin meeting agents and/or bettors for the purpose of settling outstanding gambling debts on Monday or Tuesday of each week.  (12/23/03 Aff. at 5).

♦ The evidence indicated that Gianelli was providing Ramasci with the necessary cash to pay agents and/or customers who had winning weeks. (12/23/03 Aff. at 5, 21).

♦ In an intercepted telephone call on December 29, 2003 at 8:17 a.m., Arthur Gianelli and Dennis Albertelli discussed the payment status of some of their agents, with Albertelli complaining that Paul Bendetti still owed $68,000 to the Gianelli gaming organization.  Albertelli and Gianelli also discussed Salvatore Ramasci's concern about faxing the gambling balances from his home to Gianelli.  Albertelli said that Ramasci wanted to fax the information from a "foreign" telephone number. Albertelli told Gianelli that once Albertelli completed the review of his figures, he would *fax them over to Gianelli* for his approval.  (12/31/03 Aff. at 7-8).

♦ In a wiretapped call on December 29, 2003 at 11:20 a.m., Arthur Gianelli asked Salvatore Ramasci when Ramasci was planning to come *to Gianelli's house* so the two of them could review the gaming balances for the previous week.  Ramasci replied that he would be *at Gianelli's home* in approximately half an hour. (12/31/03 Aff. at 9).[3]

---

[3]   Additional evidence is set forth, for example, at pages 11-17 of the Gianelli search warrant affidavit.

<u>The Puopolo Search Warrant</u>

The 42-page affidavit of Trooper Russolillo in support of the March 3, 2005 Puopolo search warrant ("Puopolo Aff.") explicitly incorporated by reference and attached copies of nine (9) prior wiretap affidavits by Trooper Orlando, dated November 18, 2004, December 2, 2004, December 17, 2004, December 23, 2004, December 30, 2004, January 14, 2005, January 27, 2005, February 14, 2005, and February 18, 2005.[4]  (Puopolo Aff. at 1, 18, 24, 27, 30).  Those wiretap orders had been issued by Justice Quinlan, who also issued the search warrant.  Copies of the Puopolo wiretap affidavits -- which collectively total approximately 560 pages (not including monitoring instructions) -- are submitted herewith as Exhibits 12-20.

Among other things, the evidence included the following:

♦   Two reliable confidential informants, referred to as CI-1 and CI-2,[5] separately told the State Police that Philip Puopolo was a bookmaker in Revere who was employing Stephen Russo as a clerk for Puopolo's gaming organization.  (12/17/04 Aff. at 22).

♦   Troopers Russolillo and Orlando personally had conversations with Stephen Russo during which he admitted working for Puopolo's organization.  (12/17/04 Aff. at 22).

---

[4]   Puopolo asserts on page 6, footnote 4, of his brief that there is no evidence that the wiretap affidavits were submitted along with the search warrant affidavit. Puopolo's contention is belied by the search warrant affidavit, which said at least four (4) times that the wiretap affidavits were attached (Puopolo Aff. at 14, 27, 34, 39), and said at least seventeen (17) times that the wiretap affidavits were incorporated in the search warrant affidavit (Puopolo Aff. at 1, 9, 15, 16, 18, 22, 23, 24, 27, 28, 30, 34, 35, 36, 39, 40, 42).  In any event, Justice Regina Quinlan, who issued the search warrant on March 3, 2005, was the *same* justice who reviewed the wiretap affidavits between November 18, 2004 and February 18, 2005, so she was fully familiar with them.

[5]   They are not necessarily the same people as the CI-1 and CI-2 in the Gianelli wiretap affidavits.

♦   CI-1 and CI-2 independently said that Puopolo was paying "tribute" to New England La Cosa Nostra capo Anthony "Spucky" Spagnolo.  (12/30/04 Aff. at 18).

♦   CI-1 and CI-2 often contacted Stephen Russo over the telephone to retrieve betting lines and place wagers on sports games.  When there were problems relating to their illegal gambling endeavors, Puopolo always stepped in to resolve the issues.  (12/30/04 Aff. at 11).

♦   Electronic surveillance demonstrated Puopolo's control and supervision of his criminal organization.  Puopolo routinely contacted Stephen Russo to get updates on Puopolo's gaming business and inquire about the gambling-related activities of certain bettors and agents.  (1/14/05 Aff. at 17).

♦   On December 21, 2004 at 3:43 p.m., Stephen Russo told Puopolo in a wiretapped call that one of their customers, identified only by code name "T-22," delivered the money that he owed.  (12/30/04 Aff. at 14-15).

♦   In a December 27, 2004 call at 12:46 p.m., Philip Puopolo contacted Stephen Russo to ask him how certain agents and/or bettors of his organization had done with their gambling activity.  (12/30/04 Aff. at 30).

♦   On January 1, 2005 at 1:18 p.m., Puopolo called Stephen Russo to inquire what the organization was using for a betting line (odds) on the Auburn game.  (1/14/05 Aff. at 46-47).

The affidavit demonstrated probable cause to believe that gaming evidence would be found at both the RBA and at Puopolo's residence.  The evidence included, *inter alia*, the following:

♦    Troopers Russolillo and Orlando were both familiar with the RBA, and knew it to be a haven for area bookmakers.  (11/18/04 Aff. at 52).

♦    Wiretapped calls showed that Puopolo was managing, supervising, and controlling his bookmaking operation (1/14/05 Aff. at 27, 55, 68) and that Stephen Russo often contacted Puopolo *at the RBA and at Puopolo's home* to provide information relevant to Puopolo's ongoing gaming organization.  (2/14/05 Aff. at 13).

♦    In a wiretapped conversation on November 23, 2004 at 5:28 p.m., Puopolo's bookmaking employee Stephen Russo told bookmaker Joseph Russo that Stephen Russo had to go *to the RBA* in Revere to give Philip Puopolo the "play" (street vernacular for registered bets).  (12/17/04 Aff. at 26).

♦    On December 30, 2004 at 8:07 p.m., Puopolo used his *home telephone* line at 350 Revere Beach Boulevard, Apt. P2-120, to call Stephen Russo.  During the wiretapped conversation, Puopolo asked what results they would need in the sports games that evening for the Puopolo gaming organization to have a successful night. They also discuss a customer, identified solely by the code name "T-22," who still owed Puopolo $5,000 on account of lost wagers.  Stephen Russo said he would tell "T-22" to leave the $5,000 with Peter *at the RBA*.  (1/14/05 Aff. at 26-31).

♦    In a follow-up call on December 30, 2004 at 8:49 p.m., Puopolo instructed Stephen Russo to tell Peter *at the RBA* that when Peter received the $5,000 from "T-22," Peter

should take the money home overnight and then *bring it to Puopolo* the next morning.  (1/14/05 Aff. at 63).

♦     On January 17, 2005 at 3:59 p.m., Puopolo used his *home telephone* at 350 Revere Beach Boulevard, Apartment P2-120, to call Stephen Russo.  In the ensuing wiretapped conversation, Puopolo instructed Russo to tell one of the bookmaking customers, identified solely as "Tommy," that Puopolo expected to see "Tommy" the following morning.  Puopolo complained that "Tommy" was probably not even aware of the amount that he owed to Puopolo.  Puopolo also grumbled about a customer identified as "S-3."  In addition, Puopolo told Russo to "get to the bottom" of an outstanding amount owed by Puopolo's cousin.  (1/27/05 Aff. at 17-18).

♦     In a wiretapped conversation on January 24, 2005 at 10:45 p.m., Puopolo used the telephone *at the RBA* to call Stephen Russo about the "figures" (amounts won or lost by agents and bettors).  (1/27/05 Aff. at 39-40).

♦     Stephen Russo called Puopolo *at Puopolo's home*, 350 Revere Beach Boulevard, Apartment P2-120, on January 26, 2005, at 7:06 p.m.  During the wiretapped conversation, Russo asked Puopolo whether a bettor identified as "Billy" could continue to place wagers with the Puopolo gaming organization.  Puopolo replied that "Billy" was all set.  (Puopolo Aff. at 25-26).

♦     On February 7, 2005 at 12:25 p.m., Puopolo used the telephone *at the RBA* to call Stephen Russo, who provided Puopolo with the amounts won or lost by bettors who were assigned code names consisting of the letter "X" and a number.   Other

wiretapped calls showed that the "X" bettors usually called their bets directly into the Duke Sports offshore bookmaking office.  (2/14/05 Aff. at 57-58).

♦   Stephen Russo called Puopolo *at Puopolo's home*, 350 Revere Beach Boulevard, Apartment P2-120, on February 16, 2005 at 7:14 p.m.  In the intercepted conversation, Russo said that he had accepted about 100 individual bets that day, and that before Puopolo would pay the betting customers, Puopolo should call Russo to make sure Puopolo had the correct money figures.  (Puopolo Aff. at 26).

♦   As Trooper Russollilo pointed out in his affidavit, bookmaking necessarily requires the keeping of incriminating records and "dirty" cash.  (Puopolo Aff. at 5-6).

It clearly was reasonable for the issuing judge to conclude from this and other evidence that Puopolo ran his bookmaking business from his home and from the RBA and that Puopolo therefore kept bookmaking records and cash proceeds at both his home and the RBA.[6]

<u>The Search Warrants Were Sufficiently Particular</u>

Puopolo's attack on the particularly of the search warrants also is without merit.[7]

The search warrants themselves explicitly, on their face, in their very first sentence, incorporated the underlying search warrant affidavits by reference.  *See Groh v. Ramirez*, 540 U.S. 551, 557-58 (2004) and cases there cited.  Those affidavits clearly stated that the offense under

---

[6]   Puopolo says in his brief that he knew he was a target of an investigation.  But, the wiretap interceptions and other evidence demonstrated that Puopolo nonetheless was continuing his illegal bookmaking; continuing to use his home and the RBA for that purpose; and continuing to engage in incriminating conversations over telephones.  (Puopolo Aff. at 5-6).

[7]   Gianelli has not submitted his own argument on this point, but adopts Puopolo's by reference.

investigation was illegal gaming activities that violated Massachusetts General Laws, Chapter 271, Section 17.

Moreover, the search warrants themselves repeatedly described the substance of M.G.L. c.271, § 17.  For example, Addendum A to each of the search warrants authorized the seizure of books and records "evidencing the unlawful placement, receipt and registration of bets on the outcome of sports events;" "[m]oney relating to the unlawful registration of bets, including money won and lost on account of bets on the outcome of sports events;" "[c]omputers ... used to facilitate the unlawful registration of bets;" and "[o]ther paraphernalia used to facilitate the unlawful registration of bets, such as telephones, cellular telephones, beepers, facsimile machines and adding machines."  In fact, the only category of items in Addendum A that was not specifically described with reference to illegal gaming was financial records, but money is fungible and it was entirely appropriate for the issuing judge to authorize seizure of records relating to the proceeds of the illegal gaming which, as the affidavits made clear, was a long-running conspiracy.  *See*, *e.g.*, 10/31/03 Aff. at 22-23; 11/18/04 Aff. at 43-44.

Further, the search warrants and the incorporated affidavits described the types of items to be seized, and the affidavits set forth probable cause to believe that such items would be found at the designated locations.  *See*, *e.g.*, Gianelli Aff. at 7-18, 23, 47-48; Puopolo Aff. at 5-9, 23-35, 40-42.

As shown in this brief, the Puopolo and Gianelli search warrants were valid.  But, even if they had not been, suppression would not be required or appropriate.  *See United States v. Leon,* 468 U.S. 897 (1984) (suppression not warranted when law enforcement officer's good faith reliance on search warrant was objectively reasonable); *Illinois v. Krull,* 480 U.S. 340 (1987); *United States v.*

*Woodbury*, 511 F.3d at 99-100; *United States v. Capozzi*, 347 F.3d 327, 332-34 (1st Cir. 2003);

*United States v. Owens*, 167 F.3d 739, 745 (1st Cir.1999); *see also Massachusetts v. Shepard*, 468

U.S. 981 (1984); *United States v. Morris*, 977 F.2d 677, 682 (1st Cir. 1992) (when search warrant

is valid as to some items but not as to others, court may admit the former while excluding the latter).

<u>Conclusion</u>

For the foregoing reasons, the motions by defendants Gianelli and Puopolo to suppress the

search warrant evidence should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:      */s/ Michael L. Tabak*
         MICHAEL L. TABAK
         FRED M. WYSHAK, JR.
         Assistant United States Attorneys
         U.S. Attorney's Office
         United States Courthouse
         1 Courthouse Way, Suite 9200
         Boston, MA 02210

         JOSEPH K. WHEATLEY
         Trial Attorney
         Organized Crime and Racketeering Section
         U.S. Department of Justice
         1301 New York Avenue N.W.
         Washington, DC  20530

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered parties.

/s/ Michael L. Tabak
Michael L. Tabak
Assistant United States Attorney

Date: May 1, 2008