UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA   )
   )
     v.   )      Criminal No. 05-10003-NMG
   )
MARY ANN GIANELLI   )

## SENTENCING MEMORANDUM

Defendant Mary Ann Gianelli submits this memorandum to aid the court in imposing a reasonable and appropriate sentence. For the reasons set forth below, a sentence to a two-year term of probation, with a condition that the first year be spent under home confinement, is sufficient but not greater than necessary to comply with the sentencing goals set forth in 18 U.S.C. § 3553.

## Argument

**1.    A Sentence Of Probation Is Appropriate For These Offenses Committed By This Defendant**

**A.    Ms. Gianelli's History and Characteristics**

The real Mary Ann Gianelli is nothing like the person who committed the crimes for which the court will sentence her. She is a compassionate, kind and caring person who selflessly gives of herself to nurture and help others. A devoted mother, she has raised two children and instilled in them a set of core values that will guide them as they begin to make their own ways in the world as young adults. A loving daughter, she continues to tend to the needs of her elderly mother. A reliable sister, she is always there to help when her three teenaged nephews prove to be more than their mother can control. A niece herself, she plays an important role in the care of

her elderly aunt.  Letters from her son Michael, daughter Marianne, mother, aunt and a life-long friend are attached hereto as Exhibit 1.

To person, the letter writers laud Mary Ann's devotion to others.  Michael Gianelli writes that his mother's kind heart, compassion and grace under extremely trying circumstances are qualities he wishes he could emulate.  *See* Exhibit 1.  Marianne Gianelli writes that her mother is and has been incredibly devoted to her family and that her continued presence is most needed in the unsettled times that lie ahead.  *Id*.  Her aunt and mother both write that Mary Ann's willingness to care for them and her determination to be the glue that kept her own family together and raise her children properly makes them proud.  *Id*.

Mary Ann's concern for others and willingness to give are evidenced also by her decision to become a licensed nurse.  Not surprisingly, she is an excellent nurse with stellar performance reviews and a flawless record of no discipline of any kind.  She has worked on a surgical floor and in the recovery room at two different hospitals for over ten years.  Since July 2006, Mary Ann has been employed at the MIT Medical Center as a medical assistant on the inpatient floor. MIT originally hired her as a nurse, but less than two months she was charged in this case and MIT decided to place her in a medical assistant position while the case was pending.

Mary Ann's performance at MIT has been exemplary.  She meets or exceeds all evaluation criteria and consistently receives high praise for the manner in which she communicates and interacts with patients.  *See* Performance Evaluations, 2007, 2008 and 2009, attached as Exhibit 2.  Her dedicated work ethic, high level of professionalism and ability to work with all types of patients received special note in her first review at MIT.  Her 2008 and 2009 reviews note that she excels under pressure and is very helpful during patient emergencies. *Id*.

MIT has not and will not release her as a result of her guilty plea and likely will promote her to nurse if and when it becomes clear that she will not lose her nursing license as a result of her guilty plea.[1]

Mary Ann's consistent history and her character are starkly at odds with the crimes for which the court will sentence her. Put another way, her criminal conduct truly is aberrant and contrary to the admirable way she has led her life, her own values and the values and character she has made sure her children have made their own.

**B.      The Nature and Circumstances of the Offenses**

The question arises as to how the kind, compassionate, caring and above all law-abiding Mary Ann Gianelli could have committed money laundering, structuring and gambling offenses and subscribed to false tax returns. Ironically, those same character traits led her down quite a different path that ends here.

At the age of sixteen, Mary Ann fell in love with Arthur Gianelli. They have been together ever since. He is the only man she has known during her entire adult life. Arthur made sure of that. He has been an unreasonably jealous, controlling and dominating figure in her life. Mary Ann's friend for over 35 years writes that even before Mary Ann and Arthur were married, Arthur would not permit her to socialize with her friends. *See* Letter from Shelagh Joyce, attached as part of Exhibit 2. If Mary Ann managed to meet up with a friend for dinner, it was not unusual for Arthur to show up and join them to make sure he knew what his wife was doing and with whom she was doing it. *Id.*

---

[1]      Based entirely on her guilty pleas in this case, the Board of Registration of Nursing has issued an Order to Show why it should not revoke or suspend her license. A copy of the Order is attached as Exhibit 3. A hearing date has not been set.

Mary Ann's mother and aunt echo obliquely Ms. Joyce's observations and impressions of Arthur as a domineering and controlling force that must be obeyed. Her mother writes that but for Mary Ann's devotion to her children, she would have ended her marriage to Arthur many years ago. *Id*. Her aunt writes that Mary Ann did not have the happiest of marriages and that she endured trying and difficult circumstances out of determination to hold her family together. *Id*.

Marianne Gianelli puts it perhaps most eloquently when she states that her mother's "admirable virtues of loyalty, trust and integrity to her husband and family guided her blindly to an unfortunate and compromising position." *Id*. Mary Ann's mother asks that the court forgive her daughter's mistakes which were made trying to "obey and avoid conflict for the sake of maintaining the family unit." *Id*.

What the letter writers are trying to say is that Mary Ann's criminal conduct is the direct result of her relationship with Arthur – of doing what he demanded. Over 31 trial days, the court heard witness after witness testify as to how "persuasive" Arthur could be. The court heard witness after witness describe the consequences that Arthur caused them to fear if they dared say no to his "requests." The testimony the court heard at trial depicted a fiercely intimidating man who associated with and controlled other intimidating and violent men who knew how to make people do what Arthur wanted them to do.

The court heard how Arthur carried out extortion by touting organized crime connections and threatening to arrange for New York Mafiosi to shut down restaurants. The court heard Arthur threaten on tape to stab the eyes out of the head of a woman if she did not do what he wanted. When none of that worked, the court heard how Arthur arranged to burn a business to the ground.

But for Arthur's powerful influence and control over her life, Mary Ann would not have come close to breaking any law. It was not her idea to pay the bills in the cumbersome and unorthodox fashion that caused her to structure cash transactions illegally. Nor was it her idea to draw a paycheck from Dennis Albertelli's various businesses. That was set up by Albertelli and Arthur and the monies were tallied up regularly so that the two of them would have a record of the expenses of their gambling businesses. There is no reason to believe that Mary Ann Gianelli even got any of that money. Arthur was adept at signing her name to the backs of checks he caused others to make out to her and even had a signature stamp he would use to negotiate checks ostensibly made out to Mary Ann.

Nor was it Mary Ann Gianelli's idea to continue to collect the proceeds of her husband's poker machine business after he went to jail. Having heard over the course of many weeks what kind of a person Arthur Gianelli was and the kinds of things he did to make people do what he demanded, the court should have no doubt that Mary Ann was not free to refuse. That was Arthur's money out there and Arthur was going to make sure he got it despite the fact that he was in jail.

While we all have choices in our lives and we are held accountable for the choices we make, in a very real and practical sense, Mary Ann was not free to disregard the force of her husband's will. She was no match for Arthur. Left to her own devices, she would not have committed any crimes. She will be left to her own devices for the balance of the remainder of her life. The court will hand Arthur a very lengthy prison sentence likely in excess of 20 years given the mandatory-minimum sentence the arson count carries. Having learned her lesson the hardest of ways, Mary Ann never again will put herself in the compromising positions her

husband ruthlessly put her in. The court can have the utmost confidence that a jail sentence is not required to make sure of that.

## 2.    Probation With Home Confinement Is Sufficiently Punitive

For this defendant on the facts and extenuating circumstances of this case, a sentence of probation with home confinement is sufficient but not greater than necessary to promote respect for the law and constitutes just punishment. *See* 18 U.S.C. § 3553(a) and (a)(2)(A). The Supreme Court recently held that even straight probation is punitive. *See Gall v. United States*, 552 U.S. 38, __, 128 S.Ct. 586, 595 (2007) (probation is punitive and the conditions imposed constitute "substantial restriction of freedom"). The court noted that probationers are "subject to several standard conditions that substantially restrict their liberty," including the following:

> Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking. … Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 128 S.Ct. at 595-96. *See also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' ") (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987) (footnote omitted). A special condition of home confinement constitutes a substantially greater restriction on liberty and more severe punishment than an already punitive sentence of straight probation.

In a recent case in which it urged the court to forego further incarceration in favor of supervised release with a condition of home confinement, this US Attorney's Office recognized

that such a sentence can be a "reasonable and narrowly tailored sentence that reflects [a particular] offender and [particular] conduct," even though it is outside the advisory guideline range. See Government's Memorandum In Support Of Fed. Rule Crim. Pro. 11(c)(1)(C) Plea Agreement at 6, filed in *United States v. Robinson*, Criminal No. 08-10309-MLW (extortion case involving unnamed businessman and prostitute). By acknowledging that such a non-guideline sentence could be "sufficient but not greater than necessary to effectuate the purposes of the Sentencing Reform Act," *id.*, this US Attorney's Office finally got in step with the law of the land after the most recent series of Supreme Court federal sentencing cases. *See also U.S. v Martin*, 520 F.3d 87, 96 (2008) (affirming a sentence 91 months below advisory guideline range and holding that "the district court grounded the defendant's sentence in case-specific considerations, which is the accepted practice in the post-Gall world").

Probation with home confinement is not the only punishment Mary Ann will endure in this case. The Board of Registration of Nursing likely will suspend or revoke entirely her license to practice nursing. *See* Ex. 3 hereto. That would result in a substantial loss of income. Mary Ann makes roughly half as much as a medical assistant at MIT as she would make if she were employed as a nurse.

As the court is well aware, Mary Ann also has lost her home and owes the government $125,000 as a result of posting the equity to secure her husband's release. It turned out to be a bad bet. By the time Mary Ann appears before the court at her sentencing hearing, the IRS will have taken possession of and changed the locks at 420 Main Street.

**3.     Probation With Home Confinement Affords Adequate Deterrence**

A sentence of probation for an individual who previously has never been convicted of a crime, a severe restriction on if not the total loss of the ability to earn a living at a chosen vocation, a $125,000 debt and the loss of the family home sends an appropriately strong message to those who contemplate engaging in similar criminal conduct that they are subject to life-changing deprivations of freedom, liberty and property.

The Supreme Court in *Gall* explained that respect for the law and general deterrence are not undermined when a court recognizes that the circumstances of a particular defendant's criminal conduct or her character differentiate her from the universe of defendants who have violated the same statute:

> The Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms. Moreover, the unique facts of Gall's situation provide support for the District Judge's conclusion that, in Gall's case, "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

*Gall v. United States,* 128 S.Ct. 586, 599 (2007) (citation omitted).  If this defendant receives a sentence of probation with home confinement and suffers the collateral consequences outlined above, it will in no way signal to the world at large that there are no consequences, or acceptable consequences, to racketeering, money laundering, structuring and subscribing to false tax returns.

A sentence of probation with home confinement is more than sufficient to ensure that Mary Ann Gianelli will never again run afoul of the law.  She exhibits almost all of the

characteristics that the Sentencing Commission has identified as indicators of reduced rates of recidivism. She is 52 years old, has a professional license and a stable employment history, is married with a family, does not use illicit drugs and is a first-time non-violent offender. Two recent studies[2] conducted by the Sentencing Commission show that offenders with these characteristics are among the least likely to recidivate, as well as the following:

- Age: "Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21, to 9.5% over age 50.[3] Under the Parole Commission's Salient Factor Score (SFS), which is a better predictor of recidivism than Criminal History Category, the older the defendant is and the fewer the number of prior commitments, the less likelihood of recidivism. Age is a powerful component of recidivism prediction, which the Guidelines do not take into account.[4]

- Employment: Stable employment in the year prior to arrest is associated with a lower risk of recidivism.[5]

- Education: Recidivism rates decrease with educational level (no high school, high school, some college, college degree).[6]

- Family: Recidivism rates are associated with marital status (never married, divorced, married).[7]

---

[2] Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (hereinafter "Release 1"), http://www.ussc.gov/publicat/Recidivism_General.pdf; and A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score (hereinafter "Release 2"), http://www.ussc.gov/publicat/RecidivismSalientFactorCom.pdf.

[3] Release 1 at 12 & Exhibit 9.

[4] Release 2 at 8, 13-15.

[5] Release 1 at 12 & Exhibit 10.

[6] *Id*. at 12 & Exhibit 10.

[7] *Id*. at 12 & Exhibit 10.

- Illicit drug use: offenders using illicit drugs within one year prior to their instant offense have a higher recidivism rate (31.0%) than those not using illicit drugs (17.4%).[8]

- Non-Violent Offenders sentenced under the fraud, larceny and drug guidelines are the least likely to recidivate.[9]

The shame and embarrassment Mary Ann Gianelli feels when she faces her children, mother, aunt and other family members are sufficient in and of themselves to ensure that she never will commit another crime. The court does not need to send her to jail to deliver a powerful message of deterrence.

**4.    The Government and the Defendant Are Correct That the Offenses Of Conviction Comprise a Single Group For Purposes Of Calculating the Advisory Guidelines**

It was Mary Ann Gianelli's expectation at the time she entered her plea that all of her offenses would be treated as a single combined group for purposes of calculating the advisory sentencing guidelines. That was the government's position at the time. *See* March 4, 2009 Transcript at 6 (the parties jointly recommend a total offense level of 18 before a three-level reduction for acceptance of responsibility). The parties' joint understanding and agreement was an extremely important factor in making the decision to plead.

Conceptually in the real world, it is inconceivable that the offenses of conviction would be considered separate and somehow deserving of an enhanced punishment.[10] All offenses were part and parcel of an effort to disguise income from Arthur Gianelli's gambling business and/or avoid calling attention to repeated cash transactions. That is, of course, essentially the definition

---

[8] *Id*. at 13 and Exhibit 10.

[9] *Id*. at 13 & Exhibit 11.

[10] The parties' agree that the offenses of conviction comprise a single group and that the total offense level is 15 after a three-level reduction for acceptance of responsibility, yielding an advisory sentencing range of 18-24 months. The advisory sentencing range calculated by the Probation Office based on three separate groups of offenses is 30-37 months.

of money laundering. That was also the purpose behind structuring and falsely claiming on tax returns that a portion of the gambling proceeds were legitimate salary.

It is only in the hyper-technical world of the advisory sentencing guidelines that the offenses could possibly be considered as separate and worse such that a sentence up to twice as high could be warranted. Under a proper interpretation of the advisory grouping principles of the advisory guidelines, however, the offenses do indeed comprise a single group.

The guidelines expressly provide that offenses covered by §§ 2S1.1 and 2T1.3 (structuring and subscribing to false tax returns) are to be grouped. *See* U.S.S.G. § 3D1.2(d) (including 2S1.1 and 2T1.3 as "[o]ffenses covered by the following guidelines [that] are to be grouped under this subsection").

The structuring and tax offenses properly are grouped with the RICO offenses and the underlying predicates because all of the criminal conduct causes "substantially the same harm," in this case to society as opposed to one or more identifiable victims, and comprises "two or more acts or transactions connected by a common criminal objective or constitute[] part of a common scheme or plan" -- concealing and disguising gambling proceeds to avoid detection of a gambling business. U.S.S.G. § 3D1.2. *See also* U.S.S.G. § 3D1.2(b) (group offenses that "involve the same victim" and comprise "two or more acts or transactions connected by a common criminal objective or constitute[] part of a common scheme or plan"). Additionally, the whole of Ms. Gianelli's criminal conduct fits squarely within the catchall grouping provision set forth in the second last paragraph of § 3D1.2, which permits grouping of offenses on a case-by-case basis where appropriate "based upon the facts of the case and the applicable guidelines." U.S.S.G. § 3D1.2.

If the Probation Office were correct that Mary Ann Gianelli's criminal conduct falls into three distinct groups and calls for substantially greater punishment as a result, her sentencing range would be disproportionate to several of her codefendants who were much more deeply and wholeheartedly involved in the illegal gambling business, some of whom also participated the violent crime of extortionate collection of credit. The court sentenced Salvatore Ramasci to 24 months for RICO, sports betting, gaming machines, money laundering and two counts of extortionate collection of credit. *See* PSR at ¶ 5. The indictment describes Ramasci as a bookkeeper of the gambling enterprise who coordinated the collection of money and distributed the proceeds to his criminal associates. *See* Superseding Indictment at ¶ 3f.

The court sentenced Steven Russo to 18 months for RICO and sports betting. *See* PSR at ¶ 5. He managed a betting office run by a co-defendant and participated extensively in the illegal bookmaking business. *See* Superseding Indictment at ¶ 3h.

The court sentenced Philip Puopolo to 46 months, only nine months higher than the high end of Ms. Gianelli's guideline as interpreted by the Probation Office. Puopolo not only managed and/or participated extensively in all phases of the illegal gambling operation -- sports betting, poker machines, offshore betting -- he also was described as a "loanshark" and was convicted of eight counts of extortionate collection of credit. *See* PSR at ¶ 5; Superseding Indictment at ¶¶ 3d and counts 512-519. Two counts of extortionate collection of credit and one count of witness tampering were dismissed. *Id*. at Counts 510-11, 520.

Mary Ann Gianelli did not manage anything. She was not a bookmaker, an agent or a loanshark. She certainly did not extort anyone. By no stretch of the imagination should the court be considering a prison sentence higher or remotely close to the sentences Ramasci, Russo

and Puopolo received.  Yet that is how the Probation Office interprets the grouping principles.

That is not right.

## Conclusion

For all of the foregoing reasons, the government's recommendation of a sentence of

incarceration is greater than necessary to promote the sentencing objectives set forth in 18 U.S.C.

§ 3553.  The court should impose a sentence of probation with a year of home confinement.


MARY ANN GIANELLI,
 By her attorney,

/s/ *E. Peter Parker*
E. Peter Parker
 B.B.O. #552720
151 Merrimac Street
Boston, MA  02114
(617) 742-9099

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)
and paper copies will be sent to those indicated as non registered participants on June 2, 2009.
/s/ *E. Peter Parker*
E. Peter Parker