1                  UNITED STATES DISTRICT COURT
                  DISTRICT OF MASSACHUSETTS
2

3

4  UNITED STATES OF AMERICA       )
                              )
5                         )
  vs.                      )  CR No. 05-10003-NMG
6                         )
                         )
7  ARTHUR GIANELLI           )

8

9  BEFORE:  THE HONORABLE NATHANIEL M. GORTON

10

11                    <u>DISPOSITION</u>

12

13

14        John Joseph Moakley United States Courthouse
                Courtroom No. 4
15               One Courthouse Way
                Boston, MA 02210
16          Wednesday, October 7, 2009
                  3:07 p.m.
17

18

19

20          Cheryl Dahlstrom, RMR, CRR
             Official Court Reporter
21    John Joseph Moakley United States Courthouse
        One Courthouse Way, Room 3209
22          Boston, MA 02210
      Mechanical Steno - Transcript by Computer
23

24

25

APPEARANCES:

        OFFICE OF THE UNITED STATES ATTORNEY
        By:  Fred M. Wyshak, Jr., AUSA,
             Michael L. Tabak, AUSA, and
             Natashia Tidwell, AUSA
        One Courthouse Way
        Boston, Massachusetts 02210
        On Behalf of the Government.

        LAW OFFICE OF RICHARD M. EGBERT
        By:  Patricia A. DeJuneas, Esq.
        99 Summer Street
        Boston, Massachusetts 02110
        - and -
        LAW OFFICE OF ROBERT L. SHEKETOFF
        By:  Robert L. Sheketoff, Esq.
        One McKinley Square
        Boston, Massachusetts
        On Behalf of the Defendant.

P R O C E E D I N G S

1    THE CLERK:  This is Criminal Matter 05-10003, the

2   United States vs. Arthur Gianelli.  Will counsel please

3   identify themselves for the record.

4    MR. WYSHAK:  Good afternoon, your Honor.  Fred Wyshak,

5   Natashia Tidwell and Michael Tabak for the United States.

6    THE COURT:  Good afternoon, Mr. Wyshak, Miss Tidwell,

7   Mr. Tabak.

8    MR. SHEKETOFF:  Good afternoon, your Honor.  Robert

03:07 9   Sheketoff with Patricia DeJuneas, and my client is also at

10   counsel table.

11    THE COURT:  Mr. Sheketoff, Miss DeJuneas, Mr.

12   Gianelli, good afternoon.

13    MS. DeJUNEAS:  Good afternoon.

14    THE COURT:  We have Miss Sinclair sitting in from

15   Probation.  Good afternoon to you.

16    We are here on the sentencing of Arthur Gianelli.  And

17   I have received and read the Presentence Report, the

18   government's sentencing recommendation, to which was attached

03:08 19   an affirmation of Special Agent Kelsch.  But those are the only

20   things in writing that I have received.  Is there anything that

21   I didn't mention that I should have received?

22    MR. SHEKETOFF:  It's my fault, your Honor, but I do

23   have a letter from both of his children with his wife.  And

24   they were unsigned so I thought -- and it's my mistake -- that

1  they had sent the originals to your Honor.  But apparently they

2  did not.  Unless the Court -- I will refer to some of the

3  things in those letters in my presentation.  I think that's --

4  THE COURT:  You may do so.  If you wish to make them

5  part of the record, we'll have them filed if you so desire.

6  MR. SHEKETOFF:  Thank you, your Honor.

7  THE COURT:  All right.  As I understand it, counsel,

8  there were numerous objections filed to the Presentence Report,

9  a very substantial one -- actually, two, by the government.

03:09 10  But I'm going to treat those objections as a motion for an

11  upward departure, which is, in fact, what I think they are;

12  and, therefore, we'll deal with them after I deal with the

13  objections interposed by the defendants and after we have made

14  the findings that are necessary to establish the advisory

15  guidelines.  But that's what I intend to do.  Is there any

16  objection to that?

17  MR. WYSHAK:  No, your Honor.

18  THE COURT:  All right.  Then as I said before, there

19  are numerous objections interposed by the defendants to the

03:09 20  Presentence Report.  I have thoroughly read the objections and

21  the Probation Office's response to them.  But I will go through

22  them one by one and offer the defendants an opportunity to

23  supplement their arguments if they so wish.

24  The first objection, as I understand it, is to the

25  grouping, the extortion groupings, that are set forth in

1    Paragraph 102 of the Presentence Report.  And that is allegedly

2    because McCarthy's and Clarke's were owned by the same victims,

3    and the defendants believe that they should be grouped

4    together.  The Probation Department disagrees on the grounds

5    that they were different locations, separate corporations, and

6    so forth and, further, adds that there will be no impact on the

7    guideline range because even if I were to follow the

8    defendant's objection it would only affect the number of units

9    with respect to the groupings by one-half, and it wouldn't

03:11 10    change the guideline range.

11         Do you wish to address that, Mr. Sheketoff?

12         MR. SHEKETOFF:  Not any further than I already have,

13    your Honor.  If the Court were to go in my direction on this,

14    what my basic argument would be is he's up to that Level 32 in

15    part because he got a half a point.  And so it's really -- he

16    should be between Level 32 and 33.  In other words, the

17    grouping guidelines say half a point is as good as a point.

18    But I think that's a reason to go towards the lower end of the

19    guideline as opposed to the higher end.

03:11 20         THE COURT:  You can argue that, but it does seem to me

21    that the guidelines are clear, that if he gets three-and-a-half

22    units or four units, he still gets a plus four.

23         MR. SHEKETOFF:  That's correct.

24         THE COURT:  Actually, I'm going to deny that motion as

25    being moot.

1    The second objection is with respect to Paragraphs 103

2 and 104.  Again, this relates to grouping.  The defendants

3 believe that the extortionate collection of credit, that is,

4 the so-called loansharking groups, should be aligned

5 differently.  But the Probation Department points out that

6 Section 2 -- that Section 3D1.2(d) specifically excludes the

7 subject guideline, that is, 2E2.1, from the provisions of that

8 guideline with respect to grouping and that, therefore, the

9 Probation Department's grouping is correct.

03:12 10    Do you dispute that, Mr. Sheketoff?

11    MR. SHEKETOFF:  I just stand by the objection that I

12 made.  I don't have anything to add to it.

13    THE COURT:  The objection is overruled.

14    The third objection of the defendant is with respect

15 to the adding of two levels because of a sophisticated money

16 laundering as opposed to general money laundering.  The

17 defendants argue that this was not sophisticated.  The

18 Probation Department vigorously opposes that in that the

19 transactions were layered in order to disguise the nature and

03:13 20 source of the illegal gambling proceeds; that there were

21 international financial institutions involved, escrow accounts,

22 in order to shield the source of income from scrutiny.  And

23 they believe that the defendant is eminently qualified for a

24 two-level increase for having been part of a sophisticated

25 money laundering scheme.

1          Do you wish to further address your objection, Mr.

2    Sheketoff?

3          MR. SHEKETOFF:  Not really, your Honor, except to say

4    that this wasn't sophisticated.  I'm not saying that what

5    Probation points to is not true, because there was evidence of

6    that, but that doesn't mean it's really sophisticated.  This

7    was, for the most part, buying money orders at the local post

8    office that -- and keeping records that were just absolutely

9    traceable back to him.

03:14 10         THE COURT:  I disagree.  I find that the money

11    laundering was sophisticated and that the defendant is entitled

12    to a two-level upward adjustment with respect to that

13    particular part of the Presentence Report.

14          The fourth objection of the defendant relates to the

15    base offense level for the arson.  The defendant argues that it

16    should not be 24 because there was not a substantial risk of

17    death or serious bodily injury.  The Probation Department

18    points out that there was a substantial risk of serious bodily

19    injury not only to the people in the commercial building that

03:15 20   was torched but also to -- potentially to the firefighters who

21    were called to fight it.

22          Do you wish to further address that objection, Mr.

23    Sheketoff?

24          MR. SHEKETOFF:  Well, it's really based on the facts

25    of this case, that on the facts of this case, there was no

1    serious risk.  The police and the state police could have

2    stopped them before they even got anywhere near the building.

3    They chose not to for their own investigative reasons.  But on

4    the facts of this case, I don't think there was a serious risk.

5         THE COURT:  Well, the Court finds that the points made

6    by the Probation Department are well-taken and that the base

7    offense level with respect to the arson should be 24, so it

8    denies the defendant's fourth objection.

9         With respect to Objections 5 and 6, which are related

03:16 10   to one another, the defendant objects to the four-point upward

11    adjustment for his client as having had a leadership role with

12    respect to the particular charges made.  He does not elaborate

13    on that.  The Probation Department notes that the defendant

14    cites no reason why this enhancement should not be applied.

15         Do you wish to further address that objection, Mr.

16    Sheketoff?

17         MR. SHEKETOFF:  Yes.  Throughout the report, the

18    probation officer finds a two-point role enhancement.  That's

19    what I suggest is appropriate here, too.

03:16 20        THE COURT:  Well, she finds a two-point enhancement in

21    one particular case where she finds that there weren't more

22    than five participants.  But she also finds in several places

23    that there were more than five participants and, therefore,

24    recommends a four-level adjustment, which is the distinction.

25    Whether it's more or less than five participants depends on the

1    amount of the adjustment.

2        I do find that in this case the Probation Department

3    is well-taken and that, with respect to all but the one that we

4    will point out when we get there, a four-level enhancement is

5    warranted because this defendant was clearly a leader and

6    supervisor of the criminal activities.  So Objections 5 and 6

7    are denied.

8        With respect to Objections 7 through 9, they relate to

9    the extortion by force or threat of injury.  A plus two is

03:17 10   being added for a threat of bodily injury.  The defendants deny

11   that there was such a threat.  The Probation Department

12   believes that under Application Note 3 of Guideline Section

13   2B3.2 an enhancement also is warranted where the threats are

14   for driving an enterprise out of business or threats to damage

15   property.  She finds that there were such threats.

16       The Court, unless Mr. Sheketoff can point out

17   something to me that I didn't hear at the trial, agrees.  But

18   do you have any further -- anything further to add to your

19   Objections 7 through 9?

03:18 20       MR. SHEKETOFF:  Not really other than the particular

21   witness that claimed that these threats were made was less than

22   credible, at least in my view, Mr. Bendetti.  I mean, there are

23   tape recordings of it.

24       THE COURT:  All right.  The Court denies defendant's

25   Objections 7 through 9.

1     Objections 10 through 17 are so-called dependent

2  objections.  They are with respect to -- related to all the

3  other objections and would -- obviously, if I had sustained

4  those objections, there would have been an impact on the other

5  matters within the Presentence Report.  But they, having been

6  denied, are also -- 10 through 17 are denied.

7     And then Objection No. 18 is that the defendant

8  objects to the inclusion and scoring of his offense that is

9  reported in Paragraph 170 of the guidelines.  Again, there is

03:19 10  no reason stated as to why that offense should not be scored.

11  It does end up with one criminal history point which, of

12  course, does not impact the guideline range because either one

13  criminal history point or zero, the defendant still ends up in

14  Criminal History Category I.

15     Do you wish to press that objection, Mr. Sheketoff?

16     MR. SHEKETOFF:  No, your Honor.

17     THE COURT:  The objection is denied as moot.

18     Then, finally, the defendant's Objection No. 19

19  relates to the fact that the defendant simply objects to the

03:20 20  statement of the probation officer that there were -- that

21  there are no factors that would warrant a downward departure.

22  There is no further amplification of that.  So I take it as an

23  informational objection, and it will be included in the

24  Presentence Report but is denied as moot.

25     That does take care of all of the defendant's

1   objections; and, therefore, we are ready to make the findings

2   that need to be made with respect to the advisory guidelines.

3           The recommendations in that regard start in the

4   Presentence Report at Page 29 wherein it is recommended that

5   the guideline that we are using or should use is the most

6   recent one, that is, the one -- the 2008 edition.  The Court

7   agrees with that.  Does either party disagree?

8           MR. WYSHAK:  No, your Honor.

9           MR. SHEKETOFF:  No, your Honor.

03:21 10        THE COURT:  Then we will use the 2008 guideline

11  manual.

12          And then within that manual there are multiple claims

13  that the probation officer has divided into groups.  We've

14  already dealt with some objections to the grouping, so I am

15  going to -- having denied those objections, going to establish

16  those groups as recommended to me by the Probation Office.

17          The first group is with respect to the illegal

18  gambling and money laundering counts.  They are covered by two

19  particular guidelines, 2E3.1, which is the gambling guideline,

03:22 20  and 2S1.1, which is the money laundering guideline.  And within

21  the -- two of those guidelines, the established guideline range

22  -- rather, base offense level is 12.

23          Because the defendant was convicted under Title 18 of

24  the United States Code, Section 1956, a two-level increase to

25  that offense level is warranted; and, further, as found

1  previously, because this was a sophisticated laundering scheme

2  under Subsection (b)(3), two levels more are added; and,

3  finally, because the defendant was an organizer or leader of a

4  criminal activity involving five or more participants, a

5  four-level increase is warranted by virtue of his being an

6  organizer and leader of such a conspiracy.  That yields an

7  adjusted offense level of 20.

8  Do counsel agree with the calculations of the Court?

9  MR. WYSHAK:  Yes, your Honor.

03:23 10  MR. SHEKETOFF:  Yes.

11  THE COURT:  Turning, then, to Group 2, that is, the

12  arson and extortion related to the Big Dog, the guideline

13  section that pertains is 2K1.4, the general arson guideline.

14  And, again, because the Court has found that the offense

15  knowingly created a substantial risk of serious bodily injury,

16  the appropriate offense level is 24.  Again, because the

17  defendant was an organizer or leader of a criminal activity

18  involving five or more participants, a four-level upward

19  adjustment is warranted; and the defendant, therefore, ends up

03:23 20  with an adjusted offense level for this group of 28.

21  Do counsel agree with those calculations?

22  MR. WYSHAK:  Yes, your Honor.

23  MR. SHEKETOFF:  Yes.

24  THE COURT:  The third and fourth groups relate to

25  extortion under Section 2B3.2.  And because there were two

1  separate extorted victims, McCarthy's and Clarke's, they are in

2  separate groups.  They have identical guideline calculations,

3  however.  Under 2B3.2, the base offense level is 18.  Because

4  the offense involved an express or implied threat of bodily

5  injury, a two-level increase is warranted.  And in both groups,

6  the adjusted offense level is 20.

7      Do counsel agree with those calculations?

8      MR. WYSHAK:  Yes, your Honor.

9      MR. SHEKETOFF:  Yes.

03:24 10     THE COURT:  The Court so finds.  Then turning to

11  Offense Groups 5 through 7, which, again, are identical, they

12  all relate to the collection of credit by extortion, so-called

13  loansharking, covered by Section 2E2.1.  And under that

14  guideline, because there are three separate individuals who

15  were so extorted -- Messrs. Barnes, Mousis and Castinetti --

16  there are three separate groups.  Each of them starts out under

17  2E2.1 with a base offense level of 20 and to which is added a

18  two-level increase because the defendant was an organizer or

19  leader of a criminal activity, in this case involving fewer

03:25 20  than five participants.  Therefore, the two-level increase

21  yields an adjusted offense level of 22.

22      Do counsel agree with all those calculations?

23      MR. WYSHAK:  Yes, sir.

24      MR. SHEKETOFF:  Yes, your Honor.

25      THE COURT:  Then by virtue of the combined offense

1    level guideline, which is 3D1.4, we add up all of the units

2    created by the seven groups.  They yield a total of four units.

3    And then you add that to the highest adjusted offense level,

4    which in this case was Group 2, 28.  Twenty-eight plus four

5    yields a combined adjusted offense level of 32.  There is no

6    adjustment for acceptance of responsibility; and, therefore,

7    the combined total offense level is found to be 32.

8            Do counsel agree with all of those calculations?

9            MR. WYSHAK:  Yes, sir.

03:26 10       MR. SHEKETOFF:  Yes, your Honor.

11           THE COURT:  All right.  And then turning to the

12   defendant's criminal history, as before noted, one crime in

13   1995 of violating a protective order and threatening to commit

14   a crime, this does result in the awarding of one criminal

15   history point.  However, because it's just one, the defendant

16   ends up in Criminal History Category I.

17           Do counsel agree with those calculations?

18           MR. WYSHAK:  Yes, sir.

19           MR. SHEKETOFF:  Yes, your Honor.

03:27 20       THE COURT:  Then by virtue of the charge in -- I

21   believe it's Superseding Indictment Count 275, which is the use

22   of arson in commission of a felony, a ten-year on and after

23   mandatory minimum is required.  What that means is that the

24   guideline range, which would otherwise have been 121 to 171

25   months becomes 241 -- I'm sorry.  The initial guideline range

1   was 121 to 151. And because of the mandatory ten-year

2   on-and-after sentence under Count 275, the effective guideline

3   range becomes 241 to 271 months.

4        Do counsel agree with those calculations?

5        MR. WYSHAK: Yes, your Honor.

6        MR. SHEKETOFF: Yes, your Honor.

7        THE COURT: All right. Then as I mentioned before,

8   the government's objections interposed to the Presentence

9   Report to me constitute a motion for an upward departure. I

03:28 10   have thoroughly considered not only the objections made in the

11   body of the Presentence Report but the presentence memorandum

12   or the government's sentencing recommendation which, of course,

13   deals with that at length and attached an affidavit, or an

14   affirmation, of Special Agent Kelsch of the Bureau of Alcohol,

15   Tobacco & Firearms. I'm also cognizant of the Probation

16   Department's responses to those objections.

17        If the government wishes to elaborate, it may do so.

18   Mr. Wyshak.

19        MR. WYSHAK: Yes, sir. This case -- even though only

03:29 20   one fire at the North Reading Big Dog was charged in the

21   indictment and the defendant was convicted regarding that first

22   fire, this case really involves Mr. Gianelli's attempt to

23   financially harm Mr. Colangelo by eliminating any flow of

24   income that Mr. Colangelo had. At the time, not only did he

25   have the bar/restaurant in North Reading, but he had this

business, the Sports Grille, in Boston, down on Canal Street.

In attempting to put Mr. Colangelo out of business, so to speak, he is involved in three additional arsons. And this case is really about not only that first arson but those three additional arsons, two of which caused serious damage.

I understand that the Probation Department doesn't think that there is sufficient evidence for the Court to find that the government is able to prove those additional arsons beyond a preponderance. But one thing I did note about the probation officer's report, in assessing the evidence, the Probation Department seems to have totally ignored the interview of this inmate, Gerald Kruger, who was at Wyatt with Mr. Gianelli and with this individual, Tony Raymond, during which Mr. Gianelli admitted to Mr. Kruger that he had used Mr. Raymond, a known associate of Mr. Puopolo, to set fires. The Probation Department doesn't address that, and I think that is critical in their calculation as to whether or not there's proof beyond a preponderance.

But just putting that issue aside, the facts are compelling. Two weeks after the first fire at the Big Dog in North Reading, which was foiled by the state police, there is a second fire there which causes extensive damage. Mr. Puopolo is trailed by the FBI to the vicinity of the Big Dog in North Reading, pulls into a parking lot right across the street from the restaurant, within four or five hours of the fire.

1    The FBI agent, who was not involved in this case, was

2   surveilling Mr. Puopolo on something totally unrelated, noted

3   that this was not a location that Mr. Puopolo had ever

4   frequented before.  So it's hardly a coincidence that within

5   hours of that first fire -- I mean, of that second fire at the

6   Big Dog, Mr. Puopolo physically appears in a parking lot across

7   the street.

8        Now, of course, that second fire is predated by two

9   conversations between Mr. Albertelli and Mr. Gianelli in which

03:32 10   they both discuss the fact that Mr. Gianelli had also been

11   soliciting people to set the fire at the Big Dog in North

12   Reading.

13        And I don't want to belabor the facts too much because

14   I have Special Agent Kelsch here.  I also have Special Agent

15   Lemanski.  The government is prepared to go forward with an

16   evidentiary hearing.  I'd like to put his affidavit into

17   evidence, to play some of these calls, some of which were not

18   played at the trial of this matter.  But I'd just like to give

19   you a brief preview, if I might, and then the Court can decide

03:33 20   whether or not --

21        THE COURT:  We're not going to have an evidentiary

22   hearing today.

23        MR. WYSHAK:  Okay.  Then I'll expound a little more on

24   what I think that the facts would show if Mr. Kelsch -- Special

25   Agent Kelsch and Special Agent Lemanski were allowed to

1  testify.

2         Prior to the second fire at the Big Dog, there were

3  two recorded conversations.  They're in Special Agent Kelsch's

4  affidavit -- affirmation, which clearly show that Mr. Gianelli

5  had solicited somebody else to set fire to the Big Dog.  As a

6  matter of fact, Mr. Gianelli, if you recall, was surprised when

7  he learned that Mr. McCormack and Mr. Slater had already been

8  arrested for setting fire to the Big Dog in North Reading.

9         You may recall those conversations where Mr. Gianelli

03:33 10  was questioning Mr. Albertelli about how could somebody have

11  been arrested.  I just talked to my guy on Friday.  It couldn't

12  have happened that fast.  And Mr. Albertelli was sort of

13  playing clueless because his guys got caught, and he obviously

14  was not prepared at that point in time to tell Mr. Gianelli

15  that the two people who were caught were people that Mr.

16  Albertelli had solicited to set the fire.

17         So it's clear that Mr. Gianelli is, on his own,

18  attempting to find somebody to set fire to the Big Dog, and we

19  --

03:34 20         THE COURT:  Why wasn't he so charged?

21         MR. WYSHAK:  Well, your Honor, I do concede that the

22  evidence that the government had does not amount to proof

23  beyond a reasonable doubt.  It's compelling evidence, but it is

24  not proof beyond a reasonable doubt.  If we thought it was

25  proof beyond a reasonable doubt, we would have charged it.

1    But that's not the standard for sentencing

2  considerations.  The standard for sentencing considerations is

3  proof beyond a preponderance, and that's why we're bringing

4  this information to the Court's attention at this time, so the

5  Court can consider it in determining what the appropriate

6  sentence is to give to the defendant.

7    On December 3rd, again, a week after the second fire

8  at the Big Dog, there's a fire at Mr. Colangelo's Sports

9  Grille.  Now, the second fire at the Sports Grille is almost a

03:35 10  carbon copy of the -- I'm sorry, the first fire at the Sports

11  Grille is almost a carbon copy of the second fire at the North

12  Reading Big Dog:  front windows smashed, containers of

13  flammable liquid poured inside and set on fire.

14    Within hours of that fire -- this is all in Special

15  Agent Kelsch's affidavit -- Mr. Gianelli has a recorded

16  conversation with Mr. Ramasci and directs Mr. Ramasci to go by

17  Mr. Colangelo's place of business near the Boston Garden and

18  take a look.  And Mr. Ramasci, as you may recall, cooperated

19  with the government, and he told the government that that

03:36 20  location was, in fact, Mr. Colangelo's Sports Grille.  He also

21  said he didn't know why Mr. Gianelli had instructed him to

22  observe that location, but, in fact, it was that location that

23  Mr. Ramasci observed.  And he reported back, in another

24  recorded telephone call to Mr. Gianelli, that that location was

25  closed.

1    Subsequent to that, there is a recorded conversation

2  between Mr. Ramasci and Mr. Puopolo.  And Mr. Puopolo is

3  telling Mr. Ramasci that he needs to get his fee.  And Mr.

4  Ramasci is puzzled about that.  And Mr. Puopolo says, "Like

5  last week."  There's an additional fee.  And later that same

6  day -- I believe this is on December 3rd, which is, again --

7  I'm sorry, that's on December 5th, two days after the Sports

8  Grille fire -- Mr. Puopolo calls back to Mr. Gianelli and says,

9  "That's no pay."  It wasn't done right.  There's no money, no

03:37 10  pay.  And the government submits that the first fire at the

11  Sports Grille didn't cause sufficient damage, and Mr. Puopolo

12  was essentially telling Mr. Gianelli you don't have to pay me.

13    Now, if Miss Lemanski were to testify, she would show

14  the Court that in the detailed records that Mr. Ramasci was

15  keeping there was a payment of $5,000 to Mr. Puopolo right

16  after the second Big Dog fire.  And that payment to Mr. Puopolo

17  is not a payment for the gambling business.  The Court may

18  recall that Mr. Ramasci kept a ledger, and on one side of the

19  ledger were the gambling payments to agents, and on the other

03:38 20  side of the ledger were other types of payments, such as those

21  going to Joe Yerardi and Rafia Feghi and other types of

22  payments.  And Mr. Puopolo received one of those payments,

23  right after the second Big Dog fire, of $5,000.

24    So now when he's telling Mr. Ramasci, after the first

25  Sports Grille fire, I get a fee like last week, it's the

government's contention he's referring to that $5,000 that was paid to him at the second Big Dog fire.  Those calls were on December 5th.

On December 6th, the next day, there's a second fire at the Sports Grille, which is -- causes extensive damage.  And Mr. Puopolo, Mr. Ramasci's records will show, on the next week gets another $5,000 payment from Mr. Gianelli, which is not a gambling-related expense and is consistent with Mr. Puopolo's claim that he's entitled to an extra fee.

Again, putting that circumstantial evidence together with the statements, again, made by Mr. Gianelli to Mr. Kruger, that he -- that this individual, Tony Raymond, had set fires for Mr. Gianelli and kept his mouth shut, which is consistent with the fact that Mr. Raymond was called to a federal grand jury, refused to testify, was indicted for criminal contempt and was convicted of criminal contempt.

I think that the evidence is very compelling that Mr. Gianelli and Mr. Puopolo are involved in those three fires that occurred subsequent to the time of the fire for which he stands convicted.  And I think that -- the government submits that what we have in this case is four fires, and if Mr. Gianelli were convicted of all those fires, he would be facing a maximum sentence of 30 years for each fire.  And under the statute, at least 40 years would have to be consecutive.  In other words, we would have a mandatory addition of ten years for each fire.

1    Now we have one mandatory addition of ten years.

2         He's not convicted of those fires.  We understand

3    that.  But he is convicted of one fire.  And the maximum

4    sentence for that one fire is 30 years.  And that's why the

5    government in this case is recommending that Mr. Gianelli be

6    sentenced to that maximum term of incarceration, which is well

7    within the province of the Court, not only given the nature of

8    his arson-related activity but given the nature of the

9    extensive racketeering organization that he masterminded and

03:41 10    ran for many, many years, victimizing hundreds of people.

11         Having been a prosecutor for as long as I have and

12    having dealt with organized crime and illegal gambling, I have

13    seen on numerous, more than I want to count, occasions of

14    people whose lives were broken because they got involved in

15    illegal gambling.  Illegal gambling is a disease.  It's like

16    alcoholism.  It's like drug addiction.  People can't stop.

17    They lose their businesses.  They lose their homes.  They lose

18    their families.

19         And that's the business that Mr. Gianelli was involved

03:42 20    in.  And as the Court has seen, the extensive nature of this

21    gambling business, which sometimes turns into loansharking,

22    which further victimizes peoples and provides the kinds of

23    resources to Mr. Gianelli so he can do the kinds of things he

24    did at McCarthy's and Clarke's and the Big Dog, which is to try

25    to muscle legitimate businessmen out of their businesses, I

1      think all of that warrants a maximum sentence in this case of

2      30 years.

3               THE COURT:  Thank you, Mr. Wyshak.  Mr. Sheketoff.

4               MR. SHEKETOFF:  Just to respond to the motion for

5      upward departure, your Honor?

6               THE COURT:  Yes.

7               MR. SHEKETOFF:  As opposed to the whole speech?

8               THE COURT:  Well, you can give the whole speech if you

9      want to now, Mr. Sheketoff.

03:43 10          MR. SHEKETOFF:  All right.  I will, your Honor.

11               If they thought they actually had a real case, they

12      would never have allowed Mr. Puopolo to plead to four years,

13      and they would have charged Mr. Gianelli.  How many counts were

14      in this indictment?  I mean, hundreds of counts.  And because

15      they couldn't prove those counts, these imaginary counts that

16      they have in mind, to the jury, they just want you to find

17      them.

18               You know, you can take these conversations, and,

19      certainly, the tail he spins is a possibility.  I'm not going

03:43 20      to say it's not a possibility.  There's just no proof for it.

21      It's their conjecture.  It's their best guess from the scantest

22      of evidence imaginable.

23               And Mr. Kruger -- I'm not sure if I know his first

24      name.  It's not Freddie by any chance, is it?  We don't know

25      anything about him except that he was locked up at Wyatt for

1    some period of time.  That's it.  I suppose that makes him a

2    credible person of some sort.

3           You know, as right as Probation was on many of my

4    objections, I think they're just as right on the government's

5    objection, which, by the way, was an afterthought by the

6    government.  It wasn't even in their original submission to

7    Probation.

8           I went to the web to look if I could find what the

9    Sentencing Commission -- if the Sentencing Commission had

03:44 10   broken up arson cases.  And they have.  And I was able to get

11   2003 -- I'm sorry, 2002 through 2008.  These are fiscal years

12   2002 to 2008.  In 2002, there were 60 arson cases in U.S.

13   district courts.  The average sentence was 93 months.  The

14   median was 60.

15          In 2003, there were 74 such cases.  The average

16   sentence was 96.2 months.  The median was 60.

17          In 2004, there were 57 such cases.  The average

18   sentence was 69.4 months.  The median was 48.

19          In 2005, the -- there were 40 such cases.  The average

03:45 20   sentence was 75.2 months and the median was 60 months.

21          In 2006, there were 71 such cases.  The average

22   sentence was 77.1 months and the median was 60 months.

23          In 2007, 78 such cases.  The average was 80.9 months.

24   The median was 60 months.

25          And in 2008, there were 60 such cases, with an average

1    of 78.5 months and a median of 60 months.

2        Your Honor, I want to preface my argument by saying

3    please keep this in context.  I know you're going to give a

4    substantial sentence.  That's -- I'm not trying to dissuade you

5    from giving a substantial sentence.  But there's substantial

6    and there's overboard, and that's what I'm trying to address.

7        There is a mandatory minimum sentence in this case,

8    even though I think there's some sort of double jeopardy

9    problems with charging two counts of arson under the same

03:47 10    statute, one of which requires a five-year minimum mandatory --

11    that's arson by means of incendiary device.  So you have to

12    give at least five on that count.  And arson in this case, in

13    aid of extortion, carries a ten-year minimum on and after

14    sentence.  So the lowest sentence you can possibly give, unless

15    you agreed with me that there's some sort of double punishment

16    here, is 15 years.  So I'm keeping that in context.  He wants

17    30.  I want 15.

18        I've been doing this for a very long time, 34 years.

19    And I've dealt with the Organized Crime Strike Force for a long

03:47 20    time.  Starting in 1985 was my first experience with them in

21    the Angiulo case.  This is not meant as a criticism because I

22    think they do important work, and I concede that.  Maybe some

23    of the most important work in the U.S. Attorney's Office is

24    done by the Organized Crime Strike Force.

25        But I'm not a kid at this anymore, and I've seen --

1    and it's my biggest criticism of the criminal justice system,

2    is what happens at sentencing.  I understand who they target.

3    I understand the trial process.  And my client's actually asked

4    me to say to the Court that he believes that you conducted a

5    trial -- he doesn't agree with every ruling that you made, but

6    he believes that you conducted a trial that was appropriate,

7    that was -- he says he wished he wasn't here in the seat he was

8    in to watch it.  But he thought that an effort was made to give

9    him a real trial.

03:48 10          The problem is sentencing, where we try to fix it with

11   the Sentencing Commission.  I understand why we try to fix it,

12   because it's all over the place.  I remember years ago I had a

13   case here where there were 30 guys or 24 guys -- I don't

14   remember exactly -- maybe it was 26 -- caught on a boat outside

15   the territorial jurisdiction of the United States.  It was full

16   of marijuana.  It had tons and tons of marijuana.  The theory

17   was they had come into Boston Harbor and dropped some of the

18   marijuana.

19          So everyone on this boat spoke Spanish.  There was not

03:49 20   an American citizen on the boat.  The U.S. Attorney's Office

21   only had 12 headsets and only had the ability to try 12 of them

22   at a time.  They divided them arbitrarily, not even by

23   alphabet, just totally arbitrarily, into two groups.  One

24   group, my group, of course, drew Chief Judge Caffrey, and the

25   other group drew Judge Tauro, two people on extreme ends of

1  sentencing philosophies.

2  Sentencing is a problem. Everyone knows it. And I've

3  watched the Organized Crime Strike Force for years, starting

4  with the Angiulo case, where Donato Angiulo, who was my client

5  and the government alleged was an actual shooter, someone that

6  shot people -- he wasn't charged with that, but they had tape

7  recordings that indicated that that was probably true -- was

8  convicted of racketeering and the sentence was 20 years.

9  And then we went to the Ferraras, the Vinny Ferraras

03:50 10  and the Joe Russos and Bob Carrozza, and you know Bobby

11  Carrozza from a trial that you and I had together, where Bobby

12  Carrozza was the mastermind in the case that we had. And at

13  the end, after a second trial when he went pro se and destroyed

14  the rest of us with his brilliant cross-examinations, the

15  government made him an offer for three extra years or something

16  like that. The actual shooters in that case, one of whom was

17  represented by Marty Weinberg and one of whom was represented

18  by a Worcester lawyer, the government made deals with those

19  people to get -- people that actually killed people -- to get

03:51 20  numbers like 19 and 22 or something like that.

21  I'm still from the old school. I believe that there's

22  a difference between killing a person and being a criminal and

23  not killing a person and being a criminal. To me, that's an

24  amazing line of demarcation.

25  Then we get to the Martoranos and the Kevin Weeks of

1   the world, where this office says, to break logjams or whatever

2   the reason is -- and I'm not saying these reasons are just

3   frivolous nonsense.  But whatever the reason is, we get to a

4   point where a Martorano, who confesses to 20 murders, because

5   he cooperates and because he does something, he brings closure

6   to cases.  He brings closure to cases that he commits.  He gets

7   12 years.  And Kevin Weeks, who was a participant in murders,

8   at least an aider and abettor, gets five years.

9           Now, Arthur -- arson is not a good thing.  I'm not

03:52 10  here to tell you it is.  You have to give him at least 15

11  years.  The arson drives this case in every conceivable way.

12  When we add up all these units, we end up at 32 because we

13  start at 28, and we start at 28 because of the arson.  The

14  reason you throw ten years on and after is the arson.

15          Again, Mr. Wyshak, who I have a great deal of respect

16  for, says "legitimate businessmen."  I didn't see too many

17  legitimate businessmen in this case.  If he means Mark

18  Colangelo, a guy who can't remember if his father was in the

19  Mafia or not, a guy who can't remember if he filed for

03:52 20  bankruptcy a couple of years before he took the witness stand,

21  a guy who says to me, I have to see my tax return before I tell

22  you whether I declared that as income or not.

23          These are not legitimate businessmen.  He swindled my

24  client.  That doesn't mean you have the right to set a fire and

25  try and put him out of business or to get the business back.

1   But he was in there mixing it up with my client.  In fact, I

2   think in many ways he was more cleaver than my client and more

3   devious when it came to business.

4         When the government asked for 30 years, they're trying

5   to make it so that you'll give something pretty close to that.

6   They're trying to pull you up.  He's nowhere in those people's

7   categories.  He's not a Johnny Martorano.  He's not a Donato

8   Angiulo.  He's not a Vincent Ferrara.  He's not a made member

9   of La Cosa Nostra.  He's a victim of La Cosa Nostra.  Is it a

03:53 10   symbiotic relationship?  The government argued it is.

11   Obviously, there's some symbiotic relationship here.  But he's

12   basically a victim.

13         Is gambling a bad thing?  Yes.  Does the Commonwealth

14   of Massachusetts take advantage of it every day of the year?

15   Absolutely.  Do they destroy people's lives with the various

16   games that they play?  Absolutely.  And they take no

17   entrepreneurial risk whatsoever.

18         But this is a case that the guideline -- if there was

19   no fire and you add up everything else, the guideline sentence

03:54 20   would be something like six or seven years.  I think 15 is

21   plenty, and that's what I ask you to impose, your Honor.

22         The letters from his kids say what you'd expect.  It's

23   not unusual that people have more than one face in the world.

24   And his kids love him, and they've said that in the letters.

25   And they say he pushed them to get higher education, and he was

always there for them and always encouraged them. And I think
you saw them here for much of the trial. And they love him and
they're concerned about him, and he was a wonderful father to
them.

You're going to give him a harsh sentence. I know
that. But it doesn't have to be 30 years. I think 15 is
plenty.

I want to say one other thing. I forgot. Wyatt is a
horrible place to spend four-and-a-half years. It's not a
federal -- it's not even a federal penitentiary where you have
movement; you have the ability to get programs; you have, you
know, the ability to get outside; you have the ability to sort
of live a life. We don't snuff out life in our prisons, but
places like Wyatt do.

I think you have the right to consider that. He may
hold the record for the most time spent at Wyatt. If not, he's
pretty close to it. It's a horrible, for-profit, private
prison that doesn't let people outside and doesn't allow much
movement. And I think you can take that into consideration,
that he has spent four-and-a-half brutal years at Wyatt and
that he's completely ruined. Whatever money he made, it's
gone. The government has it. They have his house. They have
everything. And, you know, he's broken.

He's screamed and he yelled and that's all wrong. But
other than this fire, where Mark Colangelo pushed him over the

1  line mentally, which doesn't excuse what happened -- there is

2  threats of violence.  That's what extortion is.  But there's no

3  one beaten up.  No one is hurt.  No one is clubbed.  No one is

4  -- it's just, you know, the mouth instead of the action until

5  we get to Mark Colangelo.

6          THE COURT:  Does the defendant wish to address the

7  Court before sentence is imposed?

8          MR. GIANELLI:  Not at this time, your Honor, upon

9  advice of counsel.  Thank you.

03:57 10          THE COURT:  Do counsel know of any reason why sentence

11  ought not to be imposed at this time?

12          MR. WYSHAK:  No, your Honor.

13          MR. SHEKETOFF:  No.

14          THE COURT:  Please stand, Mr. Gianelli.  No speeches

15  are necessary before this sentencing.  The sentence will speak

16  for itself.  But I will say a few words in that regard.  First

17  of all, I'm going to deny the government's motion for an upward

18  departure.

19          Notwithstanding their advisory status, the Federal

03:58 20  Sentencing Guidelines still serve an important role in

21  calculating appropriate sentences, and judges are required to

22  give those guidelines respectful consideration.  That is

23  because the guidelines are the product of careful study based

24  on extensive empirical evidence derived from the review of

25  thousands of individual sentencing decisions.

1        Therefore, I take my obligation to give respectful

2    consideration and deference to the guidelines very seriously,

3    and although I do not presume that a guideline sentence is,

4    therefore, reasonable, I need to be assured that there is

5    sufficient justification to support any variance from it.

6    Here, I find no such justification to vary my sentence either

7    above or below those guidelines.

8        Mr. Gianelli, the crimes for which you are being

9    sentenced are of a particularly egregious nature and for that

03:59 10    reason have been a priority of the federal law enforcement for

11    many years.  Criminal organizations such as the one you lead

12    inflict serious harm upon society in a variety of ways.  Your

13    crimes were pernicious and harmful beyond our knowing.

14        The victims of such organizations, whom I very much

15    have in mind as I impose this sentence, are often the poorest

16    members of society and already on the brink of desperation.

17    Further exploiting those individuals not only does great harm

18    to them but also to the general public by increasing poverty,

19    violence and the social costs they impose on all of us.

04:00 20        Organized crime is not only despicable but also

21    undermines respect for the law by discouraging citizens from

22    applying their skills to productive endeavors and leading

23    instead to the perception that the path to success and to the

24    quick buck is a life of crime.  It overburdens our law

25    enforcement agency and further taxes their limited resources.

1    And anyone else out there who thinks he or she can get

2   away with such conduct, which might have started as an illegal

3   gambling operation but ended up as a major crime enterprise,

4   should get the message that they are going to go to jail for a

5   significant portion of their lives if they do what you did.

6    For those reasons, the substantial sentence that I am

7   about to impose is justified and necessary to impress upon you

8   and upon others the seriousness of your criminal acts and the

9   immense harm they have caused.

04:01 10   Pursuant to the Sentencing Reform Act of 1984 and

11   having considered the sentencing factors enumerated in Title 18

12   of the United States Code, Section 3553(a), it is the judgment

13   of this Court that you, Arthur Gianelli, are hereby committed

14   to the custody of the Bureau of Prisons, to be imprisoned for a

15   term of 271 months.  This term consists of terms of 121 months

16   on Superseding Indictment Counts 1, 2, 8, 10 through 86, 88

17   through 185, 187 through 234, 239 and 240, 242 through 272,

18   274, 276, 277, 280 through 283, 284 through 329, 512, 513, 516

19   through 519; and terms of five years on superseding -- Second

04:02 20   Superseding Indictment Counts 3, 4 and 273; and terms of two

21   years on Second Superseding Indictment Counts 6 and 7, all such

22   terms to run -- to be served concurrently with each and a term

23   of 120 months -- I misspoke.

24    The 271 is the total sentence.  It is 151 months on

25   those counts that I just stated and an additional 120 months on

1  Count 275 of the second superseding indictment, for a total of

2  271 months to be served -- the 120-month sentence on 275 is to

3  be served consecutively to the terms imposed on the other

4  counts of conviction.

5  Upon release from imprisonment, you shall be placed on

6  supervised release for a term of three years.  This term

7  consists of terms of three years on Counts 1 through 4, 8, 10

8  through 86, 88 through 185, 187 through 234, 239, 240, 242

9  through 272, 273 through 277, 280 through 283, 284 through 329,

04:03 10  512, 513, 516 through 519; and terms of one year on Second

11  Superseding Counts 6 and 7, all such terms to run concurrently.

12  And within 72 hours of release from custody of the

13  Bureau of Prisons, you shall report in person to the district

14  to which you are released.

15  No fine is imposed based upon this Court's finding

16  that you are unable to pay a fine in addition to the special

17  assessment.

18  While on supervised release, you shall comply with the

19  following terms and conditions:  First, you shall not commit

04:04 20  another federal, state or local crime and shall not illegally

21  possess a controlled substance.

22  Second, you shall refrain from any unlawful use of a

23  controlled substance and submit to one drug test within 15 days

24  of release from imprisonment and at least two periodic drug

25  tests thereafter, not to exceed 50 tests per year, as directed

1    by the Probation Office.

2         Third, you are to submit to the collection of a DNA

3    sample as directed by the Probation Office.

4         And, finally, you are to comply with the standard

5    conditions that have been adopted by this Court and which are

6    described in the sentencing guidelines at Section 5D1.3(c) and

7    which will be set forth in detail in the judgment and

8    committal.

9         Mr. Gianelli, you are prohibited from possessing a

04:04 10   firearm, destructive device or other dangerous weapon.

11         You are prohibited from participating in any gambling

12    activities, including casino gambling, online gambling,

13    lotteries, sports track betting, office pools, Keno or any

14    other activities similar in nature.

15         You are prohibited from incurring new credit charges

16    or opening additional lines of credit without the approval of

17    the Probation Office.  And you are to provide the Probation

18    Office access to any requested financial information which may

19    be shared with the Financial Litigation Unit of the United

04:05 20   States Attorney's Office.

21         It is further ordered that you shall pay to the United

22    States a special assessment of $32,400, which shall be due and

23    payable immediately.

24         Mr. Gianelli, you have a right to appeal this

25    sentence.  If you choose to appeal, you must do so within ten

1  days.  If you cannot afford an attorney, an attorney will be

2  appointed on your behalf.  Do you understand that?

3          MR. GIANELLI:  Yes, your Honor.

4          THE COURT:  Is there any further business to come

5  before the Court?

6          MR. WYSHAK:  Yes, your Honor.

7          THE COURT:  Mr. Wyshak.

8          MR. WYSHAK:  The preliminary order of forfeiture, your

9  Honor, at this time should become final and included as part of

04:06 10  the sentence and the final judgment.

11          THE COURT:  And the forfeiture is in the amount of?

12          MR. WYSHAK:  There's an extensive preliminary order of

13  forfeiture, a copy of which I can hand the Court.

14          THE COURT:  Is there a bottom line or a few bottom

15  lines?

16          MR. WYSHAK:  Yeah.  Whatever interest Mr. Gianelli had

17  in Canine Entertainment Corporation, specifically $893,000.

18          THE COURT:  That will be forfeited.

19          MR. WYSHAK:  Yes, sir.  The Lynnfield property, Main

04:06 20  Street property.

21          THE COURT:  Has that already been sold?

22          MR. WYSHAK:  It has not yet been sold.

23          THE COURT:  It will be forfeited.

24          MR. WYSHAK:  The Eastern Bank treasurer's check.

25          THE COURT:  In the amount of?

1          MR. WYSHAK:  I do not have an amount here.  Hold on

2     one second.

3          $24,039.15.

4          THE COURT:  That will be forfeited.

5          MR. WYSHAK:  And there's a Clinton Savings Bank

6     treasurer's check in the amount of $5,350.02.

7          THE COURT:  That will be forfeited.

8          MR. WYSHAK:  $3,350 in United States currency seized

9     from Mr. Gianelli's home on March 5, 2004.

04:08 10          THE COURT:  That amount will also be forfeited.

11          MR. WYSHAK:  $39,000 in United States currency seized

12     on January 6, 2005, from Mr. Gianelli's home.

13          THE COURT:  That will be forfeited.

14          MR. WYSHAK:  And $2,859 in United States currency

15     seized from Robert Jezak on July 12, 2006.

16          THE COURT:  That will be forfeited.

17          MR. WYSHAK:  And $3,593 in United States currency,

18     also seized from Robert Jezak on February 28th.

19          THE COURT:  That also will be forfeited.

04:08 20          MR. WYSHAK:  The other items, I think, refer to Mr.

21     Albertelli.

22          THE COURT:  Anything -- Mr. Sheketoff?

23          MR. SHEKETOFF:  Yes, your Honor.  Two additional

24     matters.  If you would recommend to the Bureau of Prisons that

25     he be eligible for the 500-hour drug and alcohol program, he

1    had, and has, a serious drinking issue.

2    THE COURT:  I would turn to the Probation Department.

3    I did not see that in the Presentence Report.  Miss Sinclair.

4    MS. SINCLAIR:  We didn't get that impression either,

5    your Honor.  You could certainly recommend it.  He won't be

6    deemed eligible if the Bureau of Prisons reads the Presentence

7    Report the way we have.  But putting the recommendation on will

8    at least allow them to consider it.

9    THE COURT:  I will make the recommendation on the

04:09 10    advice of the Probation Office.

11    MR. SHEKETOFF:  Thank you.  And given that it's such a

12    lengthy sentence and -- I don't know that Devens is a

13    possibility.

14    THE COURT:  I do not believe Devens is a possibility.

15    MR. SHEKETOFF:  I think Otisville might be.  And I

16    would ask that you recommend --

17    THE COURT:  I will recommend to the Bureau of Prisons

18    that if they deem Otisville to be an appropriate security level

19    institution that he be incarcerated at Otisville.

04:10 20    MR. SHEKETOFF:  I did check to see if Mr. Yerardi was

21    at Otisville, and he's not according to the inmate locator.

22    Otherwise, I wouldn't have asked for it.

23    THE COURT:  Anything further?

24    MR. WYSHAK:  No, your Honor.

25    THE COURT:  We're adjourned.

1          THE CLERK:  All rise.  The defendant is remanded.

2     (Whereupon, at 4:10 p.m. the hearing concluded.)

3

4                         * * * * *

5

6                    C E R T I F I C A T E

7

8

9          I certify that the foregoing is a correct transcript

10    of the record of proceedings in the above-entitled matter to

11    the best of my skill and ability.

12

13

14

15

16

17    /s/Cheryl Dahlstrom              10/26/2009

18    Cheryl Dahlstrom, RMR, CRR       Dated

19    Official Court Reporter

20

21

22

23

24

25