# United States Court of Appeals
## For the First Circuit

————————————

No. 09-2213

UNITED STATES OF AMERICA,

Appellee,

v.

GISELE ALBERTELLI,

Defendant, Appellant.

————————————

No. 09-2478

UNITED STATES OF AMERICA,

Appellee,

v.

ARTHUR GIANELLI,

Defendant, Appellant.

————————————

No. 09-2606

UNITED STATES OF AMERICA,

Appellee,

v.

FRANK IACABONI,

Defendant, Appellant.

————————————

10-1214

UNITED STATES OF AMERICA,

Appellee,

v.

DENNIS ALBERTELLI, a/k/a Fish,

Defendant, Appellant.

_____

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

_____

Before
Boudin, Circuit Judge,
Souter,[*] Associate Justice,
Stahl, Circuit Judges.

_____

    Patricia A. DeJuneas, by appointment of the court, with whom
Robert L. Sheketoff, by appointment of the court, was on brief for
appellant Arthur Gianelli.
    Alan P. Caplan for appellant Frank Iacaboni.
    Richard B. Klibaner, by appointment of the court, with whom
Klibaner & Sabino was on brief for appellant Dennis Albertelli.
    Brian J. Kelly, by appointment of the court, for appellant
Gisele Albertelli.
    Mark T. Quinlivan, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief for appellee.

_____

June 29, 2012

_____

_____

    [*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

**BOUDIN**, <u>Circuit Judge</u>.  A federal jury convicted Arthur Gianelli, Dennis Albertelli ("Albertelli"), Frank Iacaboni, and Albertelli's wife Gisele ("Gisele") of racketeering, racketeering conspiracy or both, and a host of other federal crimes, incident to their years-long participation in a criminal organization responsible for a large illegal gambling operation.  Gianelli headed the group, with Albertelli serving as the second-in-command.

The charged criminal conduct involved four operations: the first three were different flavors of continuing illegal gambling businesses--sports betting, "football cards," and video poker--that spawned a variety of criminal support activities such as money laundering, usurious lending, and extortionate collection of credit; the fourth comprised a single venture by the three male defendants (but excluding Gisele) seeking to burn down a business in North Reading, Massachusetts.

The indictment used at trial, as narrowed by dropping various counts and other defendants, contained several hundred counts against the remaining four already named; but most involved individual transactions designated as money laundering.  The remaining 25 or so charged racketeering conspiracy, racketeering, illegal gambling business, transmission of wagering information, money laundering conspiracy, interstate travel in aid of racketeering, extortionate collection of credit, extortionate collection of credit conspiracy, and five variations of arson and

extortion crime directed to the planned burning down of the North Reading business.[1]

Before trial, the defendants jointly moved to suppress evidence obtained through a series of wiretaps, arguing in relevant part that the application for the initial wiretap--upon which all subsequent interceptions were based--was not properly authorized, did not show the wiretap was necessary, and was not supported by probable cause.  The district court, after hearing argument and reviewing the materials submitted, denied the motion in a published opinion.  United States v. Gianelli, 585 F. Supp. 2d 150 (D. Mass. 2008).

There followed a trial that stretched over several weeks and included extensive testimony and wiretap evidence directed to the operations of the group, individual transactions, and the roles of the individual defendants.  Ultimately the jury convicted all four defendants of nearly all of the charges, acquitting each defendant on between one and four counts.  Each was convicted of racketeering, racketeering conspiracy or both.

The defendants were later sentenced to terms of imprisonment as follows: Gianelli, 271 months; Albertelli, 216 months; Iacaboni, 183 months; and Gisele, 21 months.  Each of the

---

[1]An addendum to this decision contains tables that identify each charged count by name and statutory citation; indicate which defendant was charged on which counts; specify the counts on which each defendant was acquitted; and identify the sentence received by each defendant.

defendants now appeals, but with a few exceptions noted below the issues raised on appeal are common to all of the defendants.  The standard of review varies by argument and whether or not the argument was preserved in the district court.

Wiretaps.  Organized crime cases depend heavily on wiretaps.  For some of the activities--gambling, drug sales, money lending--there may be no "victims" to complain.  Written records are often minimal.  And especially where the organization is large or affiliated with a larger criminal enterprise, co-conspirators may be fearful about turning state's evidence.  So surveillance and wire taps are principal tools of investigation, and the latter require warrants.

Although a warrant issued on probable cause is enough for the police to enter and search a home, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") (codified as amended at 18 U.S.C. §§ 2510 et seq.) imposes even more stringent requirements for wiretaps and also requires compliance with state law, id. § 2516(2), which in Massachusetts means Mass. Gen. Laws ch. 272, § 99(F)(1).  Defendants argue that the initial wiretap application was not properly authorized under section 99(F)(1), as interpreted by Massachusetts' Supreme Judicial Court in Commonwealth v. Vitello, 327 N.E.2d 819 (Mass. 1975).

Vitello held that an assistant district attorney may not seek a wiretap on his own authority; rather, the district attorney

must "review and authorize" such an application in writing.  Id. at
825, 838-39.  However, so long as the matter is subject to his
review, the district attorney need not sign the application but may
authorize a subordinate attorney to make the application.
Commonwealth v. D'Amour, 704 N.E.2d 1166, 1175 (Mass. 1999).

In this case, the Essex County District Attorney by two
letters--one to three named assistant district attorneys ("ADAs")
and the other to a Superior Court judge--authorized the three
subordinates to apply to intercept calls involving Albertelli,
Gianelli and another named associate occurring over three
designated telephone lines; both letters were attached to the
actual wiretap application signed by the named ADAs; and the
district attorney's letter said that the application and any
renewals would be reviewed by the district attorney or a designee.

In addition, a separate affidavit by the district
attorney, offered in response to the motion to suppress in this
case, attested that he had in fact "reviewed draft copies of an
affidavit setting forth the probable cause and an application"
prior to issuing the authorizations, and was satisfied that they
complied with the relevant statutes.  He also stated that he
"personally reviewed every renewal application and supporting
affidavit."  These documents, the district court held, satisfied
section 99(F)(1).

Defendants argue they do not, emphasizing that in D'Amour

the specific crimes were also identified in the letter, which was dated the same day as the application, whereas in this case the application was dated one day after the authorizing letter.  The one day delay makes it possible that the district attorney read only a draft rather than the final application; but the district attorney's obligation was to superintend and take responsibility for the wiretap application, not to act as the final proofreader. See D'Amour, 704 N.E.2d at 734-35.

Citing United States v. Smith, 726 F.2d 852, 856 (1st Cir. 1984) (en banc), the defendants say that the district court should have held an evidentiary hearing on the extent of his oversight; but our remand in Smith was because "the district court did not make a particularistic inquiry" into whether the application was authorized.  Id. at 860.  Here, the district court did make such an inquiry and the only material dispute was not about what happened but whether the district attorney's version of what he did was sufficient oversight.

Nor do we agree that the wiretap application failed Title III's required showing that "other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."  18 U.S.C. § 2518(1)(c), (3)(c).  Here, the warrant application was accompanied by a detailed 74-page affidavit by Massachusetts State Police Trooper Nunzio Orlando describing the investigation and

explaining in detail the limits on what could be found without wiretaps and why individual alternatives were ineffective.

Defendants point out that these alternative techniques had allowed the agents to collect considerable information, as is evident from Orlando's affidavit, but the "partial success of the investigation did not mean that there was nothing more to be done." United States v. Cao, 471 F.3d 1, 3 (1st Cir. 2006) (emphasis omitted). For example, the affidavit explained that some of the participants in the conspiracy had not yet been identified, and that precautions taken by the known conspirators made the wiretap evidence essential to continued gathering of necessary evidence.

Defendants also complain that the affidavit contains a good deal of boilerplate, but so do judicial decisions, and for the same reason that in similar situations--here, the conduct of a bookmaking operation--much remains unchanged. The affidavit, however, included ample detail unique to this investigation, including, for example, extensive accounts of efforts at and limitations of using confidential informants, physical surveillance, and telephone record analysis.

Title III permits wiretaps to investigate "gambling" offenses generally, while the state statute--whose conditions must also be met--authorizes them for only one gambling offense: keeping or being in a place for the registering of bets. Mass. Gen. Laws ch. 271, § 17. Gianelli used an off-shore service reached by an

800 number to allow his bettors to place wagers, but the affidavit described conduct in Massachusetts of related activities such as communicating with local agents, settling disputes, and collecting payments from local bettors.

Commonwealth v. Boyle, 189 N.E.2d 844, 845-46 (Mass. 1963), held it enough that the defendant possessed "memos between the bookmaker or office and the agent or writer" of bets registered. Here, satisfying Boyle, the affidavit reported, based on confidential informants, that Albertelli and Ramasci retrieved records in Massachusetts indicating their customers' gambling balances and specific wagers from the previous week. Accord Commonwealth v. Demogenes, 211 N.E.2d 226, 227 (Mass. 1965) (section 17 covers "papers containing records of bets").

The defendants claim that the phrase "apparatus . . . for registering bets" requires that the apparatus be used in the process of recording a bet--as opposed to some other facet of the gambling business--and that registration of bets in Massachusetts must occur to violate the statute. The case law refutes that claim and the link here with Massachusetts was sufficient. Id.; Boyle, 189 N.E.2d at 845-46; Commonwealth v. Carlson, 120 N.E.2d 384, 385 (Mass. 1954).

There was probable cause to believe the three wiretap targets were violating section 17 through their sports betting business, so we can bypass the defendants' claims that probable

cause was lacking as to their football card and video poker activities; probable cause for any one such crime was sufficient. In addition, those arguments were not made in the motion to suppress and have been forfeited. Fed. R. Crim. P. 12(e), 12(b)(3); United States v. Walker, 665 F.3d 212, 228 (1st Cir. 2011).

Agent Kelsch's testimony. The defendants say that the court erred in permitting ATF Special Agent Kelsch to testify insofar as he sought to interpret for the jury conversations intercepted over the wiretaps. Similar objections were made to testimony by other agents but those made to Kelsch's testimony are representative and, at least as to some, better preserved. Review of preserved objections is for abuse of discretion, and the others for plain error. United States v. Weekes, 611 F.3d 68, 70 (1st Cir. 2010).

The focus of the disputed prosecution testimony concerned the charges relating to the effort to burn down a building in North Reading, a plot of which investigators learned initially through the wiretaps. In brief, Gianelli had partnered with Mark Colangelo and Edward Fitzsimons to open a large sports bar in Lynnfield; the venture ended in litigation between the partners; and (so the government sought to show) Gianelli had sought to bring pressure on Colangelo and Fitzsimons by burning down a building in North Reading housing a bar and a pizza joint that provided them revenue.

According to testimony from Deeb Homsi, a former Hells Angel gang member and longtime friend of Albertelli, Albertelli asked Homsi to burn down the building, explaining the coercive purpose of the crime; and he gave Homsi the address and advice on starting the fire. Homsi then recruited Michael McCormack, who in turn recruited another Hells Angels member, Sean Slater, for assistance in setting the fire. Gianelli checked in with Albertelli regularly for updates and later pressed him to finish the job.

Albertelli had separate discussions with Iacaboni about the arson project; Iacaboni secured a diagram of the building from Albertelli, and the next day told Albertelli that he had recruited his own arsonist and discussed with that man specific plans for setting the building ablaze; but, the evidence indicated, the (unnamed) would-be torch man backed out when Iacaboni told him no key was available for the target. Completion of the task reverted to Homsi's recruits.

After one failed attempt, McCormack and Slater tried again on November 13, 2003, and got a gasoline-filled container ignited at the site, but firemen extinguished the fire, having been alerted by agents who were staked out nearby after intercepting telephone calls about the plan. Slater and McCormack were arrested nearby. Albertelli then provided $10,000 to bail out Slater.

Later, Gianelli called Albertelli to express concern that McCormack might be cooperating with the government.

In advance of Kelsch's testimony, the defense sought to bar him from testifying as to the meaning of intercepted conversations which, as is not uncommon in conspiracies, were cryptic.  The judge refused to bar the testimony outright:

> It is my inclination at this time to allow Mr. Kelsch to testify with respect to specific matters that may be within his expertise as someone who knows about arson and arson investigations.  But I am not going to allow more general questions as to what happened in that conversation.  If the questions are directed specifically to specific responses or portions of the conversations and they related to matters that I believe are not entirely clear to lay persons, I will allow such testimony.  But if they don't, I will sustain objections.  And, specifically, I would expect to sustain an objection to -- after we've heard a conversation, if the question is, What is happening in that conversation, that is an objectionable question. . . . But if they are pinpointed to matters . . . that leaves a layperson with some ambiguity, I would allow such a question.  But the more generalized questions I would not allow.

The judge several times sustained objections to questions that appeared to call for unduly speculative or generalized interpretations, but a good many interpretations were allowed and some representative examples follow:

| Excerpts from defendants' conversations | Kelsch's interpretations |
| --- | --- |
|  |  |

| | |
|---|---|
| Gianelli: "What, ah, you talk to that kid?"<br>Albertelli: "I was with him the next morning, and asked if he wanted to take a ride, and he said he had to take care of the shop." | Referring to Homsi, whose brother owned a motorcycle repair shop. |
| Albertelli: "Just in case, you know, we want to go for a ride or something." | "To make sure that they have an alibi in place." |
| Gianelli: "Our way might be the only right way." | Referring to setting the fire. |
| Albertelli: "I didn't want to make it look like I knew anything." | "He's trying to conceal any knowledge he had about by whom and how the fire was set." |
| Gianelli: "How's the pizza?" | Referring to Romeo's Pizza restaurant. |
| Gianelli: "This kid probably tried to burn the fuckin' place down.  That's what I'm thinking."<br>Albertelli: "It was him?"<br>Gianelli: "Anyhow, that's the story." | "He's placing blame on Mark Colangelo. . . .  They're strategizing about what their story would be." |
| Gianelli: "Larry Murray came over last night, and this kid, I don't know, he might be talking a little bit." | "This kid" refers to McCormack. |
| Albertelli: "Not those guys, but someone else that I had talked about with it earlier."<br>Gianelli: "So we had three or four fucking parties going here." | "He means that either Mr. Albertelli and/or Mr. Gianelli have spoken to at least three or four separate individuals or groups to set the fire." |
| Gianelli: "Just make sure it's right." | Referring to the fact that the arson should be done correctly. |

Police officers commonly help interpret conversations by
translating jargon common among criminals, either as experts, Fed.

-13-

R. Evid. 702-703, or as lay witnesses offering "opinion" testimony "helpful [to the jury in] . . . determining a fact in issue," Fed. R. Evid. 701.  Such interpretations give the jury the benefit of an independent body of specialized knowledge.  See Fed. R. Evid. 702 advisory committee note; Kumho Tire Co. v. Carmichael, 526 U.S. 137, 150 (1999) (drug jargon expertise); 1 Dix et al., McCormick on Evidence § 13, at 78 (6th ed. 2006); 4 Weinstein & Berger, Weinstein's Federal Evidence § 702.04[1][c] (2d ed. 2006).

But a number of Kelsch's disputed interpretations were peculiar to these defendants and depended largely on Kelsch's immersion in the details of this investigation.  Although linguistically possible, calling such testimony "expert opinion" would lend undue credibility to it and increase the risk of reliance on information not properly before the jury as data on which "experts in the particular field would reasonably rely," Fed. R. Evid. 703, even though the "field" is merely the facts of the case.

While these dangers are lessened by treating Kelsch's interpretations as lay witness opinions, the interpretations do not reflect a traditional reason for allowing lay opinions--that many observations people make "every day in ordinary life cannot be adequately described in words confined to descriptions of observable phenomena."  Weinstein & Berger, supra, § 701.02; see also Fed. R. Evid. 701 advisory committee note.  Still, Kelsch's

-14-

testimony undoubtedly had a potential to help the jury, which is all Rule 701 requires for lay opinion.

Kelsch had investigated Gianelli's operations for years, had became familiar with the voices of the major participants, had interviewed witnesses related to the investigation, and had reviewed materials seized from the defendants. That his understanding of the oblique statements in the wiretaps might be "helpful" to the jury is an understatement; some of the defendants' wiretapped statements could be entirely unintelligible to the jury absent some context-based interpretation.

For years on end, the defendants deliberately spoke in unintelligible terms, surely to hamper prosecution of their crimes. True, the traditional division of witness examination and counsel's argument would call for the government to shower the jury with evidence of those oblique exchanges without any meaningful way of explaining it before the closing arguments of a multi-week (or multi-month) trial. And in some trials there might be a very large number of wiretaps introduced.

So, while not the most traditional lay opinion, Kelsch's testimony formally meets the requirements of Rule 701, being "rationally based on [his] perception" of the conversations, United States v. Santiago, 560 F.3d 62, 66 (1st Cir. 2009); "helpful" in the Rule 701 sense broadly understood; and yet not based on expert knowledge within the meaning of Rule 702. The problems, such as

they are, with such testimony turn rather on dangers that have been explored in various contexts in other cases:[2]

> -that the testimony may effectively smuggle in inadmissible evidence (e.g., hearsay not within some exception and perhaps inadmissible under the Confrontation Clause);

> -that the witness may be drawing inferences that counsel could do but with advantages as to timing, repetition and the imprimatur of testifying as a law enforcement officer;

> -that the witness may usurp the jury's function by effectively testifying as to guilt rather than merely providing building blocks for the jury to draw its own conclusion;

> -that the witness may be unable to point to any rational basis for the interpretation offered or be doing nothing more than speculating; and

> -that the witness may act as a summary witness without meeting the usual requirements.

These dangers, which are present in scenarios other than interpreting shielded or oblique language, vary (both in degree and kind) with the facts--as do the need for the testimony and the extent to which the witness' unique experience permits him to be helpful.  There are also available safeguards including supervision by the judge, cautionary instructions, and above all cross-

---

[2]E.g., United States v. York, 572 F.3d 415, 425-26 (7th Cir. 2009); United States v. Flores-de-Jesús, 569 F.3d 8, 20-21 (1st Cir. 2009); United States v. Freeman, 498 F.3d 893, 902-05 (9th Cir. 2007); United States v. Dukagjini, 326 F.3d 45, 53-59 (2d Cir. 2002).

examination, which is more helpful as to some dangers than others. Where the witness can explain the basis for his specific interpretations, decisions in other circuits have upheld admission of such testimony by law enforcement officers,[3] especially in organized crime and terrorism cases.

In this case, the need for interpretation was clear, and there is no indication that the potential dangers harmfully manifested themselves. The district judge's in limine ruling (quoted above) demonstrates that he gave the need for the testimony careful consideration and ruled that it must be limited to conversations that were unclear; he also sustained several objections to questions calling for speculative answers and gave a cautionary instruction at the end of the trial.

Minimizing another set of dangers, Kelsch said that the opinions were his own and that he was not purporting to represent collective knowledge. When pressed by defense counsel for the bases of his interpretations, Kelsch did not, as the defendants claim and the Second Circuit condemned in Grinage, rely on broad appeals to "the totality of the investigation" but instead usually

---

[3] Compare United States v. Jayyousi, 657 F.3d 1085, 1103-04 (11th Cir. 2011), and United States v. El-Mezain, 664 F.3d 467, 513-15 (5th Cir. 2011), and United States v. Rollins, 544 F.3d 820, 831-33 (7th Cir. 2008), with United States v. Grinage, 390 F.3d 746, 749-51 (2d Cir. 2004) (excluding such testimony where the witness said it rested on knowledge of "the entire investigation").

pointed to sources of information such as statements from Homsi and McCormack, other recorded conversations, and surrounding events.

Kelsch did say at the start of his redirect examination that his opinions drew on all that he learned in the investigation, and in a single area of questioning Kelsch stated that his opinion that the arson was motivated by extortion was based on his familiarity with the overall case.  But the interpretations Kelsch offered were his own, and the wiretaps backed up Kelsch's inference as to the purpose of the arson.  And he was subject to cross-examination as to basis and possible grounds to impeach his testimony.

As to specific interpretations of words or phrases, defense counsel vigorously cross-examined Kelsch regarding their plausibility and bases, which resulted in concessions that certain opinions were not derived from his arson expertise, as well as acknowledgments of alternative interpretations of several ambiguous statements.   Where such alternatives can be offered, the plausibility of the witness' own position--unlike, say, that of a medical expert--is readily measured by the jury.

Similarly, defense counsel impeached Kelsch at trial with a prior statement in a warrant affidavit that the motive was retaliation for past acts rather than coercion amounting to extortion;  but Kelsch explained that he had prepared the affidavit only months into his participation in the investigation and without

the benefit of information from Homsi and McCormack directly supporting the extortion rationale.  And the jury had Homsi's testimony as well as other evidence to make its judgment.[4]

The defendants raise similar objections to chunks of testimony from three other law enforcement witnesses who offered interpretations similar to Kelsch's for intercepted calls relevant to the gambling charges, but they forfeit these claims as to two of the witnesses by citing no specific testimony.  Of the remaining objections, which concern the testimony of State Police Sgt. Russolillo, only three were preserved at trial (and only these need be discussed, for the others were not plain error).

The first preserved objection as to Russolillo concerned the following question and answer:

> Q: And toward the middle of Page 2 when Dennis
> Albertelli says, "She had 80 bucks going into
> the late game."  She said, "Well, what's
> left," and so on.  What's your understanding
> of who was being discussed with the "she"?
> A: Gisele Albertelli.

The defendants do not claim that the identification of Gisele was faulty, nor do they attempt to explain why it might have been a debatable proposition or how the answer was prejudicial.  The

---

[4]Homsi testified to statements by Albertelli in soliciting Homsi's assistance--e.g., "[T]hey had a lot of money tied up in the [Lynnfield] Big Dog and the guy was holding them back, stalling, and that was it, they wanted to burn the pizza joint"--and recorded calls between Gianelli and Albertelli included references to the arson as "our only hope" and "the only right way" to resolve problems with Colangelo.

objection was generic, but to the extent we construe it as raising the issues discussed above regarding Kelsch's testimony, it fails for the reasons already set out.

That brings us to the remaining two preserved objections to Russolillo's testimony, which are of a different character in that they claim he twice offered forbidden "role-in-the-offense" testimony in discussing first a letter and then a phone call:

> Q: [As to the letter] If those particular individuals lost, how would Mr. Albertelli benefit?
> A: He benefits from the commission that he has from the losses
> Q: And did you understand Mr. Albertelli's role in this organization to be more than just an agent?
> A: Yes.
> Q: And what did you understand his role in this organization to be?
> A: To be partners.
>
> Q: Towards the end of the [recorded] conversation, Mr. Gianelli says, "Oh then take it from him.  Take it from him.  We're all right."  What is your understanding of the relationship in this organization, in the hierarchy, between Mr. Albertelli and Mr. Gianelli as reflected by that call?
> A: Dennis Albertelli couldn't make the decision on this.  He had to refer to his boss, Arthur Gianelli.

The defendants liken this to testimony condemned in United States v. Meises, 645 F.3d 5, 14-15 (1st Cir. 2011).  There, the government's first witness was the lead investigator in the case, and the government opened its case-in-chief by walking the witness through all of the steps in the investigation, culminating

in a question to the case agent of his opinion, based on the totality of the investigative steps described, about the role of each defendant in the criminal organization. <u>Id.</u> at 14. This, we held, was improper.

But <u>Meises</u> involved the kind of <u>preview</u> testimony by a summary witness that is especially troublesome, <u>United States</u> v. <u>Casas</u>, 356 F.3d 104, 118-20 (1st Cir. 2004), and purports to sum up (in advance of the evidence) the government's overall case.  In contrast, Russolillo's specialized knowledge of gambling was unquestioned, his testimony was expressly tied to the implications of specific pieces of evidence, and it was not used as a substantive preview.  There was no abuse of discretion--let alone plain error--in permitting his testimony here.

Looking finally to future cases, we think that district judges faced with interpretive testimony typified by Kelsch's ought to start, as the trial judge did here, by considering whether the testimony is meaningfully helpful to the jury, compared to the traditional device of saving the interpretive inferences for counsel in closing argument, and whether limitations can sufficiently mitigate the dangers noted earlier.  And, to the extent possible, such limitations ought to be identified.

Further, the witness should be prepared to explain the basis for any challenged interpretation and may not say only that it is based on "the totality of the investigation."  Unlike some

lay opinions (e.g., the car was going "fast"), an interpretation of a phrase or reference ought to be explicable, and dangers already adverted to lurk in one that cannot be explained. The trial judge may need in some cases to take proffers or allow cross-examination outside the presence of the jury.

Lastly, the basis relied upon for an interpretation must be one not unduly troubling to the trial judge because of apparent unreliability, undue prejudice, importation of inadmissible hearsay or some other circumstance that might make it unsuitable as an explanation. The variety of concerns and variations in cases makes it difficult to lay down rules and appropriate for wide discretion on the part of the trial judge reviewed only for the clearest abuse.

Attorney-client privilege. A contested issue at trial was the motive underlying the attempted arson; the government's case on certain of the counts required proof that the motive, as charged in the indictment, was to extort control over the Lynnfield restaurant project from Colangelo and Fitzsimons. The defense countered by urging that at worst the motive was merely revenge. The government offered both direct and wiretap evidence pointing to extortion. See note 4, above. A third line of evidence raised the attorney-client issue.

Over objection based on privilege, Mark O'Connor, an attorney and long-time friend of Albertelli, testified about a

conversation he had with Albertelli about "various strategies that might be employed to get control" of the Lynnfield restaurant from the "guys on the other side":

> [Albertelli said] [i]f they could cut off their funds, wouldn't they then fall faster in a financial house of cards?  And I said, Sure, but how is that going to happen?  And Mr. Albertelli said, Well– . . .––what if there was a fire at the Big Dog North Reading and they weren't able to take any income out of the place?

As O'Connor vehemently discouraged such an effort, Albertelli inquired, "[H]ow illegal is arson?"

Whether or not O'Connor was acting as Albertelli's lawyer in the conversation or merely as a friend, Albertelli forfeited the privilege under the crime-fraud exception which excludes communications from client to attorney made (1) when the client was engaged in (or was planning) criminal or fraudulent activity, and (2) with the intent to facilitate or conceal the criminal or fraudulent activity.  In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 74-76 (1st Cir. 1999).

In some situations, nothing sinister is implied by asking about the legality of conduct, possible penalties or both; but Albertelli certainly knew that arson was illegal, and his threshold question--"If they could cut off their funds . . . "--revealed his motive for the crime and the intent to facilitate its commission through his inquiries of O'Connor.  Once a plan to commit a crime

is conceived, disclosing that to an attorney waives the privilege.
Id. at 74-76.

Organized crime references.  To support racketeering
conspiracy charges, the government introduced evidence of
Gianelli's association with organized crime and mafia figures
through, for example, "rent" and "tribute" payments, as well as the
use of organized crime figures to collect debts.  In closing, the
government argued that the payments were in exchange for freedom to
operate the gambling operations as well as intimidation.

Iacaboni, Albertelli, and Gisele argue on appeal that all
of the evidence of mafia associations was particular to Gianelli
and unfairly prejudicial as to them.  But, having failed to object
a trial, these defendants can prevail only by showing not only
error but also a likely effect on the result, United States v.
Olano, 507 U.S. 725, 731-32 (1993), which they cannot do.  As it
happens, the jury acquitted two of the three defendants on
racketeering-related charges, bearing out its ability to disregard
any inference of guilt by association.  United States v. Flores-
Rivera, 56 F.3d 319, 326 n.2 (1st Cir. 1995).

Sufficiency.  Iacaboni also challenges the sufficiency of
the evidence against him on the arson and extortion counts, arguing
that they rely on a conspiracy that was never proved, at least as
to him.  The question is whether "any rational factfinder could
have found that the evidence presented at trial, together with all

reasonable inferences, viewed in the light most favorable to the government, established each element of the particular offense beyond a reasonable doubt." United States v. Poulin, 631 F.3d 17, 22 (1st Cir. 2011).

As previously recounted, Albertelli recruited Iacaboni on Gianelli's behalf to provide an alternative to Homsi's crew; Iacaboni obtained a diagram of the building and told Albertelli that he had recruited his own arsonist and discussed with that man specific plans for setting the building ablaze that same evening. This is not mere preparation to enter the conspiracy, as Iacaboni claims, but further along the path from agreement to completion than many conspiracies.

It was for the jury to determine whether the evidence showed a single agreement that included Iacaboni, see United States v. Jones, 674 F.3d 88, 92 (1st Cir. 2012), and the limited success by Homsi's crew did not remotely amount to a withdrawal by Iacaboni. United States v. Munoz, 36 F.3d 1229, 1234 (1st Cir. 1994). In short, no error flawed Iacaboni's conviction as to the arson and extortion counts.

Iacaboni also challenges the sufficiency of the evidence against him on the gambling counts, arguing that the evidence of his participation was too thin to support the jury's finding that he "conduct[ed]" an illegal gambling business within the meaning of 18 U.S.C. § 1955. But the statute "applies even to individuals who

have no role in managing or controlling the business and who do not share in its profits," and "proscribes any type or degree of participation in an illegal gambling business, except participation as a mere bettor." United States v. Zannino, 895 F.2d 1, 10 (1st Cir. 1990).

On Count 3, the evidence included a call between Albertelli and Iacaboni where Albertelli relayed betting lines for various football games; another call where Iacaboni offered to bring a large-scale bettor to Albertelli and split the profits evenly; and testimony from a witness who said she wrote bets "a couple of times" with Iacaboni. A jury could find that Iacaboni conducted a gambling operation.

Iacaboni also says that Count 5 essentially charged him with conducting Albertelli's football card business but that the evidence showed he and Albertelli had separate football card businesses, and Iacaboni's was too small to trigger criminal penalties under section 1955. See 18 U.S.C. § 1955(b)(1)(ii) (requiring five or more persons who conduct, finance, manage, supervise, direct, or own the illegal gambling business).

Intercepted calls between Iacaboni and Albertelli showed that Iacaboni sold his football card operation to Albertelli around November 2003, with Iacaboni continuing to share in the profits; and the evidence supported a finding that--in addition to Albertelli and Iacaboni--Gisele, Randy Albertelli, James Nadeu,

Micahel Schultzberg, John Onanian, Harold Marderosian, and Alan Bernstein all conducted that illegal business.

In closing, in connection with a number of the issues but especially the disputed testimony by Kelsch, we note that the government had a strong case which it was difficult for the defendants to counter.  The evidence against Iacaboni has already been described above and much of the evidence against the other two principal defendants (Gianelli and Albertelli) was from recordings of their own calls, a number of which were incriminatory without being overly cryptic.

One witness (Homsi), the intermediary with the arsonists, testified for the government to describe his conversations with Albertelli.  Gianelli was recorded on various calls inquiring repeatedly about Homsi's progress and pressing Albertelli to speed up the arson plans; after the arrests, Gianelli expressed concern that one the arsonists might be talking.  One of the two arsonists found at the scene (McCormack) also testified for the government. And Albertelli's discussion with his lawyer friend featured a telling admission.  There is no reason to believe here that innocent defendants have been convicted.

Affirmed.

ADDENDUM

| Count # | Crime |
|---|---|
| 1 | Racketeering conspiracy, 18 U.S.C. § 1962(d) |
| 2 | Racketeering, 18 U.S.C. § 1962(c) |
| 3-5 | Illegal gambling business, 18 U.S.C. § 1955 |
| 6-7 | Transmission of wagering information, 18 U.S.C. § 1084 |
| 8, 184 | Money laundering conspiracy, 18 U.S.C. § 1956(h) |
| 9-183, 185-236, 273, 278-327 | Money laundering, 18 U.S.C. § 1956(a)(1)(A)(I), (B)(I) |
| 267 | Conspiracy to commit arson, 18 U.S.C. § 371 |
| 268 | Arson, 18 U.S.C. § 844(I) |
| 269 | Use of fire/explosive to commit a felony, 18 U.S.C. § 844(h)(1) |
| 270, 274, 276 | Conspiracy to commit extortion, 18 U.S.C. § 1951 |
| 271, 275, 277 | Attempted extortion, 18 U.S.C. § 1951 |
| 272 | Interstate travel in aid of racketeering, 18 U.S.C. § 1952(a)(3) |
| 328, 330, 332 | Conspiracy to commit extortionate collection of credit, 18 U.S.C. § 894(a)(1) |
| 329, 331, 333 | Extortionate collection of credit, 18 U.S.C. § 894(a)(1) |

| Defendant | Counts Charged | Counts Acquitted | Sentence |
|---|---|---|---|
| Gianelli | 1-183, 185-272, 274-323, 328-333 | 5, 272 | 271 months |
| D. Albertelli | 1-183, 185-273, 278-300, 324-327 | 272 | 216 months |
| Iacaboni | 1-3, 5, 267-271 | 2 | 183 months |
| G. Albertelli | 1, 2, 5, 184-232 | 185-187, 201 | 21 months |