UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES

V.  CR. No. 05-10003-NMG

ARTHUR GIANELLI

MOTION TO RECONSIDER MOTION FOR COMPASSIONATE RELEASE

Arthur Gianelli, by his attorney, moves that this Court reconsider its prior denial without prejudice of his motion for compassionate release.

The coronavirus continues to be a significant health risk to Mr. Gianelli while he remains incarcerated at FCI, Ft. Dix. The covid infection rate at Ft. Dix continues at a fluctuating but high rate. Mr. Gianelli has contracted and is recovering from COVID-19 infection and suffers from certain hypertension and other medical issues which increase the anxiety he experiences attendant to his concerns of re-infection in a prison with among the highest, and at times the highest, rate of covid infection in the Bureau of Prisons system. Mr. Gianelli has served more than 188 months of the 271 month sentence imposed. He presents as a minimal risk to re-offend, is no danger to another person or the general community, and proposes a release plan to reside with his daughter which has been approved by the Probation Office. In short, it is legally permitted and humanely appropriate to grant release.

INTRODUCTORY STATEMENT

This motion is presented pursuant to 18 U.S.C. section 3552(c(1)(A), and incorporates by reference arguments and exhibits previously presented together with additional arguments and exhibits attached.

By this motion this Court is specifically informed of developments relevant to areas of concern identified in its January 15, 2021 Memorandum and Order denying without prejudice compassionate release.  These developments demonstrate compassionate release should be granted.

MR. GIANELLI'S CURRENT HEALTH

Mr. Gianelli's health has deteriorated since January 15, 2021.  At age 62.5 plus, he suffers from high blood pressure, is pre-diabetic, experiences shortness of breath, has restricted mobility due to chronic knee problems, and severe muscle and joint pain.  On January 5, 2021 Mr. Gianelli tested positive for the COVID-19 virus and now experiences the collateral consequences of the illness including headaches, tinnitus, shortness of breath, severe joint and muscle pain, difficulty sleeping, dizziness, fatigue and chills.

On February 1, 2020 Mr. Gianelli was seen in the medical unit at Ft. Dix.  At that time he showed high blood pressure readings at 153/93 and 148/97.  On February 18, 2021 his blood pressure readings were 130/87.   On February 25, 2021 his blood pressure readings were 167/83.  At that time the nurse informed him these results would be reported to the doctor, but to date he has not been seen by a doctor or anyone regarding his high blood pressure since February 1.   He continues to experience the same COVID-19 symptoms including intense tinnitus, prolonged fatigue and severe joint and muscle pain.

According to the Center for Disease Control, COVID-19 presents Mr. Gianelli with particularly acute risk of further health complications as a consequence of his hypertension. "The Centers for Disease Control has identified hypertension as a comorbidity that increases the likelihood of serious risk of COVID-19." (See Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease, Centers for Disease Control and

prevention, available at https://www.cdc.gov/coronavirus/2019-ncov/hop/clinical guidance-management-patients.html (last update Apr. 18, 2020). There is no question the risk to older adults in their 60's from COVID-19 increases with age." (https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html (last visited January 6,2021)). See, e.g., *United States v. Platte*, 2020 U.S. Dist. LEXIS 109342 at 6 (D.N.H. June 22, 2020) (Hypertension is recognized risk factor for COVID-19) (Compassionate Release granted); *United States v. DeBartolo*, 2020 WL 3105032 at *2 (D.R.I. June 11, 2020) (Compassionate Release granted) (Discussing comorbidity of hypertension and COVID-19) (Compassionate Release granted); *United States v. Hilow*, 2020 U.S. Dist. LEXIS 9617 at 9-10 (D.N.H. June 2, 2020) ("Even controlled hypertension in conjunction with COVID-19 is a health risk" (Compassionate Release granted), citing with approval *United States v. Harrell*, 2020 WL 2768883 at 3 (E.D.MICH. May 28, 2020) ("Finding an extraordinary and compelling reason even though Defendant's medical conditions were not severe because his conditions still exacerbate each other, placing his in a much more vulnerable position than a healthy person if he were to get COVID-19"); (Granting Compassionate Release); *United States v. Ramirez*, 2020 U.S. Dist. LEXIS 83363 at 10 (D.MA.) (Young, J.) ("Compassionate release can be available to inmates who show they suffer from serious medical conditions that diminish their ability to self-care in the environment of a facility." (Compassionate Release granted) *United States v*. 2021 U.S. Dist. LEXIS 10755 at 20 (D.D.C. Jan. 2021) (CompassionateRelease granted) ("Where facilities are facing severe C0VID-19 outbreak, hypertension alone or in combination with other non-aggravating health conditions has been found to constitute extraordinary and compelling circumstances justifying release"); *United States v. Salvagno*, 405 F. Supp. 420 (N.D.N.Y. 2020) (Decision sets forth thorough

evaluation of the relationship between hypertension as a risk factor and COVID-19) (Granting compassionate release to FCI Fort Dix inmate based on hypertension combined with conditions at FCI Fort Dix).

The Ft. Dix medical records attached as Exhibit (2A) and Mr. Gianelli's affirmation (Exhibit 1) conclusively demonstrate Mr. Gianelli suffers from medical problems placing him at a high risk of reinfection from the highly contagious and lethal COVID-19 virus. His risk is specific, not general, particularized not speculative.

UNSAFE CONDITIONS IN MR. GIANELLI'S CELL BOCK BUILDING 5711

Mr. Gianelli is presently confined to the second floor of a three floor Cell Block Building No. 5711 with approximately 151 COVID-19 infected inmates on the second floor and an additional 46 COVID-19 infected inmates on the first floor. Last week 6 inmates on the third floor of the Building (in a purported "isolation" area) tested positive for Coronavirus and were shifted to the second floor in close proximity to Mr. Gianelli. The conditions in Cell Block Building 5711 have created a COVID-19 hot-bed breeding ground for the COVID-19 infection. (Exhibit 1).  The highly contagious and potentially lethal contagion has ping-ponged among the inmates in Cell Block 5711 infecting over 80 percent of the inmates.   Indeed, within the last few weeks an inmate (Dominic Pugliesi) housed on the second floor of the Cell Block was removed from the Building and on information and belief was released, in a coma, on life support.

Sanitary conditions in Mr. Gianelli's unit are substandard, contribute to, and exacerbate risk to his health and life.  Windows and window ledges, toilets, sinks, showers, tables, chairs, floors, stairs, staircase railings, walls, doors, door-jambs, telephones, computer keyboards and light switches are not disinfected on a daily basis. Indeed, the vast majority of the exposed areas are never disinfected. Mop sinks and mop buckets are not disinfected after each use. Wet mop

heads and dust-mop heads are not laundered on a daily basis. Prison authorities have not on a regular basis supplied disinfectant and hygiene supplies to inmates in Cell Block Building 5711. Nor have they allowed inmates access to DMQ (a disinfectant effective against COVID-19). Other than posting signs throughout the Cell Block Building, the prison has not implemented preventive measures set forth in the CDC guidelines. Correction officers enter the building without wearing masks or any protective gear. New masks are not distributed to inmates with any regularity; and the masks handed out on an *ad hoc* basis are inferior in quality and fall apart after washing. Many correction officers do not wear masks or other protective gear as they circulate between buildings on the East Compound and then enter Cell Block Building 5711. Temperature checks of inmates were infrequent and have recently ended. Ambulances come and go without explanation. Garbage is everywhere, with skunks, possums and gophers rooting in the refuse stored in a dumpster adjacent to the rear entrance to the Cell Block Building. The prison is now run with a skeleton staff because many officers are not reporting to work. No social distancing has been implemented. None is even possible given the interior configuration of barracks-style cell blocks where inmates are jammed into cramped 12-man dormitories or 4-man and/or 2-man rooms. Mr. Gianelli sleeps in a 2-man room in a bunk less than 6-feet away from his cell mate.

Of further significance, many corrections officers refuse to be vaccinated against the coronavirus.

In a Notice to Inmates issued April 11, 2020, the Ft. Dix Warden admitted "Social distancing is not possible in this environment. (Notice available at https://www.aclunj .org.download-file/view-online/2748/1451).

The proposed release plan will minimize Mr. Gianelli's risk of reinfection as well as the risk of him spreading the virus. His daughter is well versed in COVID-19 preventive measures having been educated in proper protection procedures by her mother, a registered nurse with 40-years experience. (Exhibit 2B). These measures will protect neighbors and minimize any conceivable infection risk to the community.

Exhibits through XXX aptly portray the COVID-19 reality at Ft.Dix.

A January 15, 2021 letter to The Honorable Michael E. Horowitz, Inspector General of the Department of Justice (Exhibit 2C) merits particular attention because it brings sharp focus to the reinfection risk Mr. Gianelli faces every day. The salient points set forth in the Letter are as follows: (1) "FCI Fort Dix once again has the most severe COVID-19 outbreak of all federal prisons"; (ii) Additional oversight at FCI Fort Dix 'is urgently needed to protect the safety of incarcerated individuals and staff... ; (iii) the BOP has had 10 months to learn how to protect the incarcerated individuals and staff at FCI Fort Dix during this pandemic, and has failed; (iv) BOP "mitigation strategies" at FCI Fort Dix are not working; (v) "Without additional oversight, BOP will continue to endanger the lives of the incarcerated individuals and staff at FCI Fort Dix." At the time the Letter was written to DOJ Inspector General Horowitz approximately 1500 inmates and 50 staff at FCI Fort Dix had tested positive for the Coronavirus. (See also, January 12, 2021 letter to Warden Ortiz, Exhibit 2D; December 8, 2020 letter to Michael Carvajal, Director BOP, Exhibit 2E)

On or about February 1, 2021, Ft. Dix Warden David E. Ortiz was "reassigned" (See Exhibit F) His reassignment in not surprising in view of the ineffective, chaotic and confused response to COVID-19 outbreaks at the prison and the inability of staff under his direction to protect the inmates.

When he was relieved of command Warden Ortiz was transferred to an administrative office (a desk job) in Philadelphia. (Google search, undated February 1, 9:39 am posted February 1, 5:05 am; by Joe Atmonavage /N.J. Advance Media for NJ.Com). His reassignment in the midst of the ongoing Coronavirus onslaught at Ft. Dix speaks volumes with respect to the incompetence and ineptitude of the purported "Plan" to stem the spread of the Coronavirus contagion and protect the inmates.  You do not change commanders in the midst of a life-and-death conflict unless there is a "compelling and extraordinary" reason to change.

Just prior to the reassignment of the Warden, a NJ.Com article points out the New Jersey congressional delegation had placed the Warden and Ft. Dix under increased scrutiny. United States Representative Andy Kim in a public statement issued shortly before the "reassignment" of Warden Ortiz demanded "the Federal Bureau of Prisons(BOP) institute a lockdown as COVID-19 continues to tear through FCI fort Dix." He called on the BOP Director Michael Carvajal, "to take immediate action" at FCI Fort Dix "where the number of active COVID-19 cases is nearly double the number at any other BOP facility in the country." Congressman Kim bluntly declared: "I continue to hear from Bureau of Prisons (BOP) leadership that the situation is under control or improving, but it is clearly not." (Burlington County Times, January 11, 2021 edition).

The implications regarding the lack of reliable and credible information with respect to the COVID-19 situation at Ft. Dix are both notable and regrettable.  The inability of the BOP to impede the spread of the Coronavirus and to protect the inmates against the lethal contagion has resulted in at least one known death at Ft. Dix.  On January 22, 2021 the BOP announced the death of Myron Crosby. (Exhibit 2G). Mr. Gianelli is at similar risk.

REINFECTION RISK

As the medical science regarding the COVID-19 reinfection risk evolves and more studies and statistics become available there is an ever increasing number of reported cases of individuals who have tested negative and purportedly "recovered" from COVID-19 and later tested positive again. Reinfection is a harsh undeniable reality in the Coronavirus universe.

The first documented case of COVID-19 reinfection in the United States occurred in Nevada in August 2020, and the symptoms attendant to the reinfection were more severe than the first infection. (See, e.g., Richard L Tillett, et al, Genomic Evidence for Reinfection with SARS-CoV-2; a case study October 12, 2020. https://www.thelancet.com/journals/lanif/article/ppl51473-3099 full text also noting other reinfection cases occurred; Sarah McCammon, 13 USS Roosevelt sailors test positive for COVID-19, again, NPR (May 16, 2020) (Reporting 13 Sailors who had apparently recovered from COVID-19 and tested negative then tested positive for a second time) available at https://tinyurl.com/v7g7ee8u).

At least one Ft. Dix inmate was likely reinfected. He first tested positive for COVID-19 in the Spring of 2020 when he was housed at FCI Elkton, a BOP facility with an early COVID-19 outbreak. When months later he was transferred from FCI Elkton to FCI Fort Dix he tested positive again on December 10, 2020. He experienced much more severe symptoms in connection with his documented COVID-19 reinfection. See Noah Goldberg, Prisoners at risk of catching COVID-19 a second time behind bars asking to be released, N.Y. Daily News (Jan. 10. 2021), available at (https://www.nydailynews.com/new-york/ny-covid second-cases-among-prisoners-20210111-tedyjcpwznajzh3xa4hbgjiiqi-story.html).

In light of the growing number of reinfection cases, federal district courts across the nation have considered the risk of reinfection in granting compassionate release. See, e.g., *United*

*States v. Keys*, 2020 U.S. Dist. LEXIS 212867 at 8-9 (E.D.CA. Nov. 13, 2020) (Granting compassionate release to inmate "who was infected with COVID-19 but did not develop severe symptoms in part because...of the low risk of reinfection could have on an inmate's health"); *United States v. Yellin*, 2020 U.S. Dist. LEXIS (S.D.CA. June 20, 2020) (same); *United States v. Sandoval-Flores*, 2020 U.S. Dist. LEXIS 210723 at 15-16 (D.UT. Nov. 9, 2020) (Discussion regarding CDC updates regarding the risk of reinfection from the COVID-19 virus); *United States v. Craig,* 2020 U.S. Dist. LEXIS 185635 at 5 (D.MD. Oct. 6, 2020) (Recovery from the COVID-19 virus "is not firm evidence [Petitioner] is no longer as a heightened risk. Of severe illness from COVID-19, according to the CDC") (citation omitted); *United States v. Remarque*, 2020 U.S. Dist. LEXIS 73000 at 9 n.l (D.MD. Apr. 27, 2020) ("The Court recognizes that individuals who have tested positive are not necessarily immune from reinfection, citing Stacey McKenna, What Inmunity to COVID Really Means," published in Scientific American (Apr. 10, 2020). *United States v. Haynes*, 2020 U.S. Dist. LEXIS71021 at 38 (E.D.N.Y. Apr. 22, 2020): 'These decisions reflect, to borrow a term, the right side of history on the carceral questions they consider...".

The weight of authority, coupled with the increasing documented cases of reinfection and the unsafe, unsanitary and unhygienic conditions in Cell Block Building 5711 where Mr. Gianelli is imprisoned compel the conclusion the risk of COVID-19 reinfection must be considered as part of the compassionate release calculus.

*United States v. Barajas*, 2020 WL 3976991 at \*10 (S.D.N.Y. July 10, 2020) is particularly instructive with respect to the reinfection issue. Barajas was a 39-year-old man in relatively good health who filed for compassionate release based upon BOP mishandling of the COVID-19 situation at an Oklahoma correctional facility known as Grady. Barajas had tested

positive for the Coronavirus. The court did not restrict evaluation of the compassionate release application to pre-existing medical conditions. Instead, the court considered the "recent COVID-19 diagnosis and the basically disturbing circumstances around it... the record... has made it abundantly clear that Grady is not up to the challenge of protecting its inmate population from COVID-19." (Id.). As a result, the court concluded "continued detention at Grady presents enough of a risk to [Defendant's] health so as to constitute 'extraordinary and compelling circumstances' for release." (Id.)  The court reasoned:  "In the backdrop of all these issues at Grady is our lack of understanding about Covid-19. In general, we still know extraordinarily little about the long-term prognosis for a patient diagnosed with Covid-19. Indeed, although the government and its witnesses stunningly minimize defendant's condition as mild or asymptomatic, some research to date at least indicates that the absence of severe symptoms does not necessarily diminish the risk of long term health complications (*Barajas*, *supra*, at 10 (citation omitted)."

In *United States v. Long*, 2021 U.S. Dist. LEXIS 7453 at 8 (C.D.IL. Jan. 14, 2021) the court observed: the CDC recognizes "[reinfection of individuals who have previously been infected with COVID-19 is possible" and "[several countries including Hong Kong, Belgium, The Netherlands and the United States have confirmed cases of re-infection." Of even greater importance, the same judge in *United States v. Budd*, No. 07-cr-40026 at *6-7 (C.D.IL. Jan. 11, 2021) explicitly admonished: "[ Individuals in the custody of the BOP are not guinea pigs to test" and "the proposition that the risk of reinfection is negligible is "speculative." Based upon pre-existing medical conditions no more severe than those afflicting the Defendant in this case and the "apparent uncertainty surrounding the long-term danger of reinfection," the court found Budd, "has established extraordinary and compelling reasons warranting compassionate release."

Two deaths occurring FC1 Jesup and FCI Memphis were inmates the BOP previously reported as "recovered." (See Legal Information Services Association Report dated 1/12/21). Apparently the word "recovered" in BOP parlance has an "Alice-In-Wonderland" meaning, where on this Side of the Looking Glass (in the real world) inmates deemed "Recovered" still die.

As the court eloquently stated in *Thakker v. Doll*, 2020 Dist. LEXIS 59459 at 19-21 (M.D.PA. Mar. 31, 2020). "In times such as this, we must acknowledge the status of a mere few weeks ago no longer applies. Our world has been altered with lightning speed and the results are both unprecedented and ghastly... Our constitution and laws apply equally to the most vulnerable among us... This is true even for those who have lost a measure of their freedom."

Since this court's January 15, 2021 order, conditions at Ft. Dix relating to the COVID-19 virus have rapidly and continuously deteriorated. The pernicious changes have substantially elevated the lethal coronavirus reinfection peril Mr. Gianelli faces every day in Cell Block Building 5711. Daily he endures this risk of reinfection without any means of protecting himself. The CDC has advised "[T]he only way to slow the spread of the virus is to practice 'social distancing'... and social distancing is particularly difficult in the penal setting." *United States v. Kess*, 2020 U.S. Dist. LEXIS 105986 at 12-13 (D.MD. June 17, 2020), citing Coronavirus Disease 2019 (COVID-19), "How to Protect Yourself and Others, Ctrs. for Disease Control and Prevention." See *Seth v. McDonough*, 2020 WL 2571168 at *2 (D.MD. May 21, 2020) in turn citing *Coreas v. Bounds*, 2020 WL 1063133 at *2 (D.MD. Apr. 3, 2020) ("Prisons, jails and detention centers are especially vulnerable to outbreaks of COVID-19."); accord *Brown v. Plata,* 503 U.S. 493, 519-20 (2011) (Kennedy, J.) (Referencing medical expert opinion concluding prison system is a "breeding ground for disease") (citations omitted).

11

In this context, the court granting a motion for compassionate release in *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 58718 at 24 (E.D.PA. Apr. 1, 2020) observed the specific COVID-19 situation at FCI Fort Dix "is particular alarming." Similarly, the court in *United States v. Fernandez*, 2020 U.S. Dist. LEXIS 190157 at 10-11 (S.D.N.Y. Oct. 14, 2020) granted compassionate release based in part upon the COVID-19 outbreak at FCI Fort Dix. In early November 2020, the court in *United States v. DePergola,* 2020 U.S. Dist. LEXIS 205740 at 4 (D.MA. Nov. 4, 2020), granted compassionate release to an inmate with a long criminal history in light of the "alarming COVID-19 outbreak at FCI Fort Dix."

The present COVID-19 reality at Ft. Dix is even more alarming than when decisions were rendered in *Rodriguez, Fernandez and DePergola*. The number of inmates at Ft. Dix who have tested positive for Covid-19 has dramatically escalated; one inmate died, one was released in a coma and the Warden has been relieved of command. Indeed, the number of inmates testing positive in Mr. Gianelli's cell block has skyrocketed to more than 80 percent of the inmates.

SECTION 3553 FACTORS WEIGH IN FAVOR OF RELEASE

In *Pepper v. United States*, 179 L. ed. 2d (2011) (Sotomayor, J.) the Court provided definitive guidance regarding the weight to be accorded post-sentencing conduct in determining requests for sentence reduction. "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify the crime and the punishment to ensue [citation omitted]." Justice Sotomayor expressly acknowledged: "the need for the sentence imposed to serve the general purposes of sentencing set forth in §3553(a)(2) in particular to afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant and provide the defendant with needed educational or

12

vocational training... or other correctional treatment in the most effective manner §§ 3553(a)(2)(B)- (D)... In assessing... deterrence, protection of the public; and rehabilitation... there would seem to be no better evidence than a defendant's post-incarceration conduct."

The principles enunciated in *Pepper, supra*, apply with full force to motions seeking compassionate release. See, e.g., *United States v. Day*, 2020 U.S. Dist. LEXIS 133586 at 22 (E.D.VA. July 23, 2020) ("[The Court has, as permitted, particularly considered Defendant's conduct in custody, which 'provides the most up-to-date picture of [his] history and characteristics'" citing *Pepper, supra*); *United States v. Chambers*, 956 F. 3d 667, 675 (4th Cir. 2020) (Appropriate to consider post-sentencing conduct under First Step Act); *United States v. Rosado*, 2020 U.S. Dist. LEXIS 85067 at 16 (D.MA. May 14, 2020) (Hillman, J.) (same) (*Pepper, supra*, "has been extended to First Step cases..."), citing *United States v. Williams*, 993 F. 3d 841, 844 (8th Cir. 2019) (same); *United States v. Martin*, 2020 U.S. Dist LEXIS 122311 at 19 (E.D.PA. July 13, 2020) ("[We are mindful of the Supreme Court's direction in *Pepper v. United States*").

Mr. Gianelli's unblemished record during his incarceration over the past 16-years is the true picture of his present character, attitude and propensity. He was sentenced to a term of 271 months, has no disciplinary history, is minimal risk to reoffend, and has served 80% of his statutory term, and has a projected release date with statutory good time of October 16, 2024. (Exhibit 2H)   Under *Pepper, supra*, compassionate release should be granted.

See, e.g., *United States v. Lenagh,* 2009 U.S. Dist. LEXIS 9226 at 19 (D.Neb. 2009) cited with approval in *United States v. Beck*, 2019 U.S. Dist. LEXIS 106542 at 31 (M.D.N.C. 2019). As the district court expressly recognized in *United States v. Mei*, 2020 U.S. Dist. LEXIS

74491 at 10 (D.MD. Apr. 25, 2020), incarceration during the COVID-19 outbreak sufficiently increased the severity of the sentence beyond what was originally anticipated"). See *United States v. Pena*, 2020 U.S. Dist LEXIS 85431 at 9-14 (S.D.N.Y. May 8, 2020) (Court granted compassionate release for FCI Fort Dix inmate) ("The COVID-19 pandemic presents and extraordinary and unprecedented threat to incarcerated individuals.. .[Each hour that elapses threatens incarcerated individuals with greater peril." These words aptly describe the exploding COVID-19 contagion at Ft. Dix. (See Exhibits); *United States v. Adeyemi*,2020 U.S. Dist. LEXIS 117743 at 81-83 (E.D.PA. July 6, 2020) (Granting FCI Fort Dix inmate motion for compassionate release ("FCI Fort Dix... is facing a significant outbreak of COVID-19.") (Id. at 14). (Collecting cases granting compassionate release motions filed by inmates at FCI Fort Dix, Id., 2020 U.S. Dist. LEXIS 11743 at 47 n.183).

As the court poignantly stated in *Thakker v. Doll*, 2020 U.S. Dist. LEXIS 59459 (M.D.PA. Mar. 31, 2020) at 7, "a remedy for unsafe conditions need not await a tragic event." See *Helling v. McKinney*, 509 U.S. 25, 33 (1995) (White, J.) ("It would be odd to deny [relief to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground nothing yet happened to them.").

Mr. Gianelli compares favorably to the compassionate release granted by this Court to the defendant in *United States v. Rachal*, 2020 U.S. Dist. LEXIS 114799 (D.MA. June 30, 2020) who at age 68 was convicted of a violent felonies – armed bank robbery (and had a history of violent crimes), sentenced to 101 months incarceration, served slightly more than 50% of his sentence at FCI, Buttner (where COVID related conditions were less onerous than at Ft. Dix), The Bureau of Prisons designates Ft. Dix is a low security facility housing inmates without a

pattern of violence and/or those exhibiting violent of disruptive tendencies. His non-violent record during his incarceration and his age demonstrate his risk of recidivism is virtually non-existent. (Exhibit 2H). Mr. Gianelli is not a risk to the community.

CONCLUSION

    For the above stated reasons Mr. Gianelli asks this Court to grant his motion for release and re-sentence him to time served with three years supervised release, or to home detention to serve the remainder of his sentence.

ARTHUR GIANELLI
By his attorney,

*Elliot M. Weinstein*

Elliot M. Weinstein
BBO #520400
83 Atlantic Avenue
Boston, MA  02110
617-367-9334

CERTIFICATE OF SERVICE

I certify that a copy of this motion has been served on all parties via ECF system.

*Elliot M. Weinstein*